UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

PHILIPPE E. ST JUSTE,
*Plaintiff*
v.
JP MORGAN CHASE BANK , N.A.,
CITY OF PHILADELPHIA, OFFICE OF RISK MANAGEMENT,
MECCA ABDULLAH,
ANTHONY CURTOSI JR.,
OFFICER LEONARD,
JANE DOE CONSTABLE, and
JOHN DOE SUPERVISING SERGEANT
*Defendants*
**No.** _2:25-cv-04742-KBH_

---

COMPLAINT

USDC-EDPA REC'D CLERK
2026 SEP 14 PM8:45

Plaintiff, Philippe E. St Juste, appearing pro se, for his Complaint against the Defendants named herein, alleges as follows:

PARTIES

1. Plaintiff Philippe E. St Juste is an adult individual residing in Philadelphia County, Pennsylvania.
2. Defendant JPMorgan Chase Bank, N.A. ("Chase"), is a national banking association headquartered in New York, doing business at various locations, including 1100 Market Street, Philadelphia, PA 19107.
3. Defendant City of Philadelphia, Office of Risk Management ("City"), is a governmental entity located at 1515 Arch Street, 14th Floor, Philadelphia, PA 19102, responsible for overseeing claims and liabilities involving the City and its officers.
4. Defendant **Mecca Abdullah** is an individual who, at all relevant times, was employed by Chase as the Branch Manager at its 1100 Market Street location in Philadelphia, Pennsylvania, and is sued in her individual capacity.

5. Defendant **Chase Constable, presently name unknown ("Jane Doe Constable")**, is an individual who, at all relevant times, provided security at Chase's 1100 Market Street location in Philadelphia, Pennsylvania, and participated in the events alleged herein. She is sued in her individual capacity. The plaintiff will substitute her true name upon identification.
6. Defendant **Anthony Curtosi Jr.** is an individual who, at all relevant times, was a police officer employed by the Philadelphia Police Department ("PPD"), acting under color of state law, and is sued in his individual capacity.
7. Defendant **Officer Leonard**, whose full name is presently unknown, is an individual who, at all relevant times, was a police officer employed by the PPD, acting under color of state law, and is sued in his individual capacity. The plaintiff will supplement his full name upon identification.
8. Defendant **Supervising Sergeant, presently name unknown ("John Doe Sergeant")**, is an individual who, at all relevant times, was a supervising police officer employed by the PPD, acting under color of state law, and participated in and/or supervised the events alleged herein. He is sued in his individual capacity. The plaintiff will substitute his true name upon identification.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to **28 U.S.C. § 1331**, as this action arises under the Constitution and laws of the United States, including **42 U.S.C. §§ 1981 and 1983.**
10. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to **28 U.S.C. § 1367**, as those claims form part of the same case or controversy as Plaintiff's federal claims.
11. Venue is proper in this District pursuant to **28 U.S.C. § 1391(b)** because a substantial part of the events and omissions giving rise to the claims occurred within the **Eastern District of Pennsylvania**, and Defendants conduct business and maintain offices within this District.

## FACTUAL ALLEGATIONS

### A. Opening of the Joint Account and Deposit of Estate Funds

12. On April 5, 2023, at approximately 1:48 p.m., Plaintiff visited Defendant JPMorgan Chase Bank, N.A.'s ("Chase") branch located at 1100 Market Street in Philadelphia, Pennsylvania, with his aunt for the purpose of opening a joint checking account to assist in managing expenses and financial obligations associated with the recent death and estate of Plaintiff's

mother. Plaintiff and his aunt met with Chase banker Qingmei "Cecilia" Qing, who assisted them in opening the account. (*See Exhibits A–D.*)

13. Plaintiff informed Qing of the purpose of the account and of his mother's recent death. Chase therefore knew from the inception of the banking relationship at issue that the deposited funds were intended, in substantial part, to address time-sensitive family and estate obligations.
14. Plaintiff deposited a total of $10,428 into the newly opened account. The deposit consisted of $8,028 in cash and $2,400 in seven checks received from family members and other persons contributing toward Plaintiff's family and estate-related expenses.
15. The $8,028 cash deposit consisted of $5,000 in $100 bills, $1,000 in $50 bills, $2,000 in $20 bills, and $28 in smaller denominations. None of the seven checks exceeded $500. At Qing's direction, Plaintiff deposited two of the checks using Chase Mobile and delivered the remaining checks and cash to a Chase teller identified as Michael. (*See Exhibits E–F.*)

**B. Chase Freezes Both Accounts and Demands Information From Check Issuers**

16. On April 7, 2023, Plaintiff discovered that Chase had restricted access not only to the newly opened joint account but also to Plaintiff's preexisting personal checking account, which Plaintiff had maintained with Chase since approximately 2007.
17. When Plaintiff attempted to access his accounts electronically, Chase displayed the message: "We locked your account due to suspicious activity. Please call us to resolve this issue." Plaintiff could not access either his longstanding personal checking account or the newly opened joint account. (*See Exhibit G.*)
18. On April 10, 2023, at approximately 11:19 a.m., Plaintiff visited a Chase branch located at 490 Fulton Street in Brooklyn, New York. Plaintiff spoke with a Chase employee identified as Penny and with a Chase representative by telephone. Plaintiff explained the restrictions on his accounts and was told that the issue would be resolved and his accounts should become accessible within approximately twenty-four hours. (*See Exhibit H.*)
19. The accounts remained restricted the following day. On April 11, 2023, at approximately 10:42 a.m., Plaintiff visited another Chase branch, located at 402 Myrtle Avenue in Brooklyn, New York, where he spoke with Chase employee Tevin Campbell and another Chase representative by telephone.
20. Chase requested telephone numbers for persons who had issued checks deposited into the joint account. Plaintiff provided contact information for check issuers, including Marie Alberte Pierre and Gisele Gachette, treasurer of Premiere Eglise Methodiste Unie (First United Methodist Church). Campbell told Plaintiff that the matter should be resolved by the end of that business day. (*See Exhibit H.*)

21. Despite Plaintiff's cooperation, the restrictions remained in effect.
22. On the morning of April 14, 2023, Plaintiff again called Chase. The first two Chase representatives with whom Plaintiff spoke requested telephone numbers for the check issuers. Plaintiff asked to speak with a manager, who reiterated Chase's demand for the issuers' contact information.
23. Plaintiff provided five of the requested telephone numbers and advised Chase that he would call back with the remaining two. Plaintiff thereafter called Chase again and spoke with a Chase representative identified as Maria, to whom Plaintiff provided the final two telephone numbers.
24. Maria refused to accept the telephone number Plaintiff supplied for check issuer Marie Guerrier and demanded another telephone number for her. The plaintiff explained that he did not have another number.
25. During that conversation, Plaintiff expressly told Maria that the escalating level of scrutiny to which Chase was subjecting him felt discriminatory and that he had never previously experienced such treatment from Chase.
26. Maria nevertheless informed Plaintiff that Ms. Guerrier would have to physically present herself at a Chase branch. Plaintiff explained that Ms. Guerrier had limited mobility and that requiring her physical appearance at a Chase branch was not a workable solution. The call ended without Chase restoring Plaintiff's access to his accounts. (*See Exhibit I.*)

### C. Plaintiff Returns to the 1100 Market Street Branch

27. Later on April 14, 2023, at approximately 3:27 p.m., Plaintiff entered the Chase branch at 1100 Market Street in Philadelphia to resolve the continuing account restrictions and, if Chase would not restore access to his accounts, to terminate his banking relationship with Chase. (*See Exhibits H–I.*)
28. Within approximately five minutes of arriving, Plaintiff was taken to the office of Chase Private Client Banker Jeison Brito. Plaintiff explained that both of his checking accounts had been inaccessible for approximately one week, that he had already visited two Chase branches in Brooklyn, and that he had repeatedly communicated with Chase employees and telephone representatives without obtaining a resolution.
29. Brito undertook to contact the Chase department responsible for the restrictions. The plaintiff remained in Brito's office while Brito attempted to reach that department.
30. From approximately 3:30 p.m. until approximately 4:59 p.m., Plaintiff remained in Brito's office while Brito was on hold or otherwise attempted to reach Chase personnel. Brito did not instruct Plaintiff to leave the branch during this period.

31. At approximately 4:59 p.m., after approximately ninety minutes without resolution, Plaintiff stepped into the reception area, called Chase from his own telephone, reached a Chase corporate representative, and established communication regarding his accounts.
32. At approximately 5:07 p.m., while Plaintiff was speaking with Chase corporate, Brito came to the reception area and instructed Plaintiff to end his call and return to Brito's office because Brito was attempting to resolve the matter through his own call. Plaintiff complied, ended his established call with Chase, and returned to Brito's office, where Brito remained on hold.
33. While waiting, Plaintiff began a telephone conversation at approximately 5:12 p.m. with his acquaintance, Dr. Derrick Kofi Acheampong.
34. As the branch's regular business hours were ending, Plaintiff specifically told Brito that it was getting late. Brito reassured Plaintiff that he was fine remaining in Brito's office while they waited for Chase to address the account restrictions and joked with Plaintiff about the length of the wait.
35. At approximately 5:33 p.m., Chase finally answered Brito's call. Plaintiff ended his personal telephone conversation and participated in the discussion concerning his accounts.
36. Chase again requested contact information for Marie Guerrier. Plaintiff supplied the same telephone number he had already provided to Chase earlier that day.
37. Chase refused to accept that telephone number. Plaintiff offered to place Ms. Guerrier on a live telephone call so that Chase could speak with her directly, but Chase refused that alternative as well.
38. Plaintiff again explained that Ms. Guerrier had limited mobility and that requiring her to appear personally at a Chase branch was not feasible.
39. Plaintiff also proposed that Chase simply void or exclude Ms. Guerrier's approximately $200 check and release the remainder of Plaintiff's funds. Chase refused that proposed resolution.
40. At approximately 5:38 p.m., after Chase continued to refuse Plaintiff's proposed alternatives, Plaintiff informed Brito that he no longer wished to maintain accounts with Chase and requested that both accounts be closed and his funds returned.

## D. Abdullah and the Bank Constable Intervene

41. At approximately 5:39 p.m., Mecca Abdullah entered Brito's office with the constable nearby. Abdullah did not identify herself to Plaintiff as the branch manager, as Brito's supervisor, or as otherwise holding authority superior to Brito. Plaintiff explained that his accounts had remained restricted despite approximately one week of visits and telephone calls and that, because Chase would not restore his access, he wanted to close the accounts and receive his funds.

42. Less than ten minutes earlier, Brito had expressly reassured Plaintiff that he was fine remaining in Brito's office while they waited for Chase to resolve the account restrictions. Brito never withdrew that permission and never instructed Plaintiff to leave the branch.
43. Plaintiff informed Abdullah that he had been a Chase customer for approximately fifteen years. Plaintiff also explained the urgency of obtaining access to his money, including that his mother had recently died, that the funds were connected to obligations arising from her death and estate, and that he needed access to his money.
44. Abdullah repeated Chase's position that Ms. Guerrier would have to appear at a Chase branch. Plaintiff explained that this was not feasible because of Ms. Guerrier's limited mobility.
45. Plaintiff again proposed that Chase void or remove Ms. Guerrier's approximately $200 check and return or release the remainder of the funds. Abdullah stated that Chase could not do so.
46. Plaintiff told Abdullah that, as a Chase customer of approximately fifteen years, he believed the ordeal and treatment he had experienced were discriminatory. Abdullah responded dismissively that Plaintiff could call Chase corporate and make a complaint.
47. Plaintiff further asked Abdullah why, if Chase had already withdrawn the deposited check funds from the issuers' banks approximately nine days earlier, Chase had neither made those funds available in his account nor returned them to the issuers.
48. Abdullah did not answer Plaintiff's question concerning the disposition of the funds. Instead, she instructed Plaintiff to leave the branch. At the time, Plaintiff had not been informed that Abdullah held authority superior to Brito, and Brito—who had expressly permitted Plaintiff to remain less than ten minutes earlier—did not instruct Plaintiff to leave or tell Plaintiff that his prior permission had been revoked.
49. After Abdullah instructed Plaintiff to leave, Plaintiff simply sat back down in the chair where he had been seated facing Brito.
50. Almost immediately, the Pennsylvania State Constable, who was nearby and dressed in full active-duty uniform, approached Plaintiff and stated, "Why are you staying? You're going to get arrested."
51. The plaintiff responded, "I don't wanna be here. I will leave as soon as I know what's happening to my money."
52. Brito remained present and did not instruct Plaintiff to leave, withdraw his earlier permission for Plaintiff to remain, or tell Plaintiff that Abdullah possessed authority superior to his own.
53. Before Philadelphia police officers arrived, the constable attempted to physically pull Plaintiff from the chair in which Plaintiff was seated.
54. The constable thereafter used her radio or otherwise caused Philadelphia police to be summoned to the Chase branch.

## E. Philadelphia Police Arrive and Arrest Plaintiff

55. Philadelphia Police Officer Anthony Curtosi Jr. was among the first responding police officers to enter the Chase branch.
56. Upon Officer Curtosi's arrival, Plaintiff attempted to engage him regarding the situation. Curtosi did not meaningfully engage Plaintiff or inquire into his explanation and instead stated that he was there to take Plaintiff to jail.
57. At that time, Plaintiff was seated in a chair. Plaintiff was not attacking anyone, attempting to flee, or threatening the officers or bank personnel.
58. Plaintiff held his wallet in his right hand while his left hand held or rested upon his right wrist. The plaintiff remained seated and did not verbally threaten the responding officers.
59. The circumstances involving the responding officers were therefore those of a seated bank customer involved in a conversation concerning access to and disposition of his bank funds, not a violent crime in progress.
60. Curtosi and the constable physically removed Plaintiff from the chair and brought him to the floor.
61. During the effort to restrain Plaintiff, Curtosi bent Plaintiff's fingers and controlled his right arm, the constable controlled his left arm while additional Philadelphia police officers entered the branch.
62. Officer Leonard and other officers participated in the detention and restraint of Plaintiff. A supervising sergeant also arrived and exercised supervisory authority at the scene.
63. At the direction or prompting of the constable, Plaintiff was moved from the office area toward the branch reception area.
64. As multiple officers were physically carrying Plaintiff from Brito's office toward the reception area, the supervising sergeant directed the officers, "Just put him down and handcuff." The officers thereafter placed Plaintiff on the floor and continued the restraint.
65. This body-worn-camera evidence contradicts the police incident report's account that, "while attempting to escort the defendant out of the bank he fell to the floor." Plaintiff did not simply fall while being escorted from the bank; multiple officers were carrying him when the supervising sergeant directed them to put him down and handcuff him.
66. While Plaintiff was surrounded and physically controlled by multiple law-enforcement personnel, Officer Leonard announced words to the effect of, "I'm gonna drive stun him."
67. Officer Leonard thereafter deployed his Taser against Plaintiff approximately three times in drive-stun mode.
68. At the time of the Taser applications, multiple officers and the constable were immediately surrounding and controlling Plaintiff. The plaintiff was not armed.

69. The constable remained immediately beside Plaintiff during the use of force and was positioned near Plaintiff's right side or foot during the Taser applications.
70. After the force was used, Plaintiff was turned onto his stomach and handcuffed. Officer Leonard then asked, "What's he getting locked up for?" Curtosi responded, "Trespass. Defiant trespass." Leonard's question reflected that, up to that point, he had participated in Plaintiff's seizure and the use of force without having been informed of the offense for which Plaintiff was being arrested.
71. Leonard also asked whether Plaintiff could speak, after Plaintiff had remained silent throughout the officers' physical encounter with him. Curtosi responded that Plaintiff could speak. Plaintiff had not verbally confronted, threatened, or argued with the officers during the encounter, and Leonard's question was consistent with Plaintiff's silence during the seizure and use of force.
72. More than twenty-six Philadelphia police officers ultimately responded to or were present in connection with the incident at the Chase branch.
73. During the arrest, the constable retrieved Plaintiff's backpack from Brito's office and carried it to the reception area where Plaintiff was being detained by the responding officers.
74. After Plaintiff had been subjected to force and restrained, Curtosi thanked the constable and then stated to another responding officer, in substance, "She tried to help me, but he was locking up." Curtosi's statement, together with the constable's physical involvement in removing Plaintiff from the chair and handling Plaintiff's belongings during the arrest, reflected her active participation with the responding officers in effectuating Plaintiff's seizure and arrest rather than merely remaining present as bank security.
75. Following the use of the Taser, police radio communications repeatedly sought confirmation regarding whether any responding officers had been injured or remained safe from harm. The supervising sergeant can be heard asking, "Any injuries to police?" and thereafter separately confirmed with Curtosi and another responding officer that they were uninjured.
76. Seconds later, another officer's body-worn camera captured Officer Leonard asking over the radio whether the officer had been able to "resume the assist." The officer responded, "I've resumed like three times."
77. A separate body-worn-camera recording shows the supervising sergeant again resuming the assist and confirming that no officer had been injured. Officer Leonard can thereafter be seen resuming the assist again while Plaintiff was being guided through the bank vestibule.
78. Collectively, the body-worn-camera recordings document at least six inquiries or confirmations concerning whether the responding officers were injured or safe from harm following the encounter.

79. During those repeated inquiries concerning officer safety, no comparable radio inquiry or on-scene medical assessment was made concerning Plaintiff, even though Plaintiff had just been subjected to three Taser applications to his back and was being removed from the bank in police custody.
80. Plaintiff was arrested for defiant trespass and transported from the Chase branch into Philadelphia police custody.
81. At least one civilian bystander visibly recorded portions of the incident using a mobile device. Plaintiff's arrest and the force used against him therefore occurred in the presence of Chase employees, police officers, customers, and members of the public.

F. Detention and Denial of Medical Attention

82. Plaintiff remained in police custody for approximately fourteen hours following his arrest.
83. Plaintiff sustained injuries from the physical arrest and repeated Taser applications, including injuries to his back and physical pain and respiratory symptoms.
84. Despite the use of a Taser against Plaintiff multiple times, officers at the Chase branch did not provide or procure medical evaluation for Plaintiff before transporting him into custody.
85. While detained, Plaintiff repeatedly requested medical attention.
86. Between approximately 7:00 p.m. and 10:00 p.m., Plaintiff asked a patrolling detention guard for medical assistance approximately eight times.
87. The plaintiff separately requested medical assistance from a processing officer.
88. At approximately 3:00 a.m. or later, after processing, Plaintiff communicated his need for medical attention to a nurse or medical staff member.
89. Despite these repeated requests, Plaintiff was not provided meaningful medical examination or treatment for the injuries sustained during the arrest and Taser applications.
90. Plaintiff was held in a cold cell while suffering from the effects of the force used during his arrest.
91. During the same period, police personnel had repeatedly inquired about injuries to officers at the Chase branch, yet neither the officers at the scene nor detention personnel provided Plaintiff medical assistance notwithstanding his visible exposure to repeated Taser applications and his subsequent requests for care.
92. Plaintiff was released the following morning without having received the medical treatment he repeatedly requested.
93. Following his release, Plaintiff sought medical care, including evaluation at Albert Einstein Medical Center and subsequent treatment through Penn Medicine. Plaintiff experienced back

strain, respiratory symptoms, and other physical effects lasting beyond his release and subsequently underwent approximately two months of physical therapy. (*See Exhibits J–K.*)

### G. Chase's Treatment of Plaintiff Following the Arrest

94. Following Plaintiff's arrest, Plaintiff was prohibited or instructed not to enter Chase branch locations.
95. Chase continued restricting Plaintiff's access to his accounts and funds after the arrest.
96. On or about April 19, 2023, Chase sent Plaintiff an electronic communication reflecting that the account balance had reached $0.00 or was below an approved limit.
97. Chase's account records reflected removal or reversal of funds associated with the account, including funds beyond the approximately $200 Guerrier check that Chase had identified as requiring additional verification.
98. Funds were thereafter re-credited on or about April 20, 2023, but Plaintiff was not contemporaneously informed in a manner that restored his practical access to the funds.
99. Because Plaintiff had been barred from Chase branches following the April 14 incident and feared returning to a Chase location without counsel, Plaintiff did not return to a Chase branch until June 8, 2023, when he did so accompanied by counsel.
100. On June 8, 2023, Plaintiff appeared at Chase with counsel and closed the accounts or completed the process necessary to terminate his banking relationship with Chase.

### H. Continued Direct Communications After Plaintiff Obtained Counsel

101. Following the April 14 incident, Plaintiff instructed Chase that he was represented by counsel and that communications concerning the dispute should be directed through his attorney.
102. Chase nevertheless continued contacting Plaintiff directly between approximately April 17, 2023 and late May 2023.
103. Chase placed or caused multiple calls to Plaintiff, including calls or voicemail communications on or about April 17, April 20, April 21, May 3, and May 11, 2023.
104. On May 3, 2023, Plaintiff received three Chase calls within approximately two hours.
105. On May 4, 2023, Plaintiff again confirmed with his attorney and Chase that communications concerning the dispute should proceed through counsel.
106. On May 11, 2023, Chase nevertheless left Plaintiff a voicemail concerning Plaintiff's complaint to the Consumer Financial Protection Bureau ("CFPB"). (*See Exhibits O–R.*)
107. Following closure of the accounts, Chase continued sending Plaintiff electronic account statements from approximately June 8 through August 25, 2023.

108. Those statements initially reflected a $0.00 balance but subsequently represented that an account was overdrawn and reflected an increasing negative balance even though Plaintiff had terminated his checking-account relationship with Chase. (*See Exhibit S.*)

## I. Criminal Proceedings

109. As a result of the April 14 arrest, Plaintiff was prosecuted for defiant trespass.

110. The plaintiff contested the charge and requested discovery concerning the incident.

111. On or about May 1, 2023, the prosecution sought dismissal of the criminal matter.

112. Plaintiff's criminal case ultimately was dismissed on September 11, 2023 after the prosecution failed to provide the requested discovery and failed to proceed with the prosecution. (*See Exhibit T.*)

## J. Resulting Injuries

113. As a direct result of the events described above, Plaintiff sustained physical injuries from being subjected to repeated Taser applications (*See Exhibit J-K.*)

114. Plaintiff experienced continuing back pain, respiratory symptoms, and other physical effects requiring medical evaluation and approximately two months of physical therapy (*See Exhibit J-K, N.*)

115. Plaintiff also suffered humiliation and emotional distress from being arrested and subjected to force in the Chase branch in view of Chase employees, police officers, customers, and members of the public.

116. Plaintiff lost meaningful access to funds needed for personal, family, and estate obligations during a period immediately following his mother's death.

117. The inability to access those funds interfered with Plaintiff's ability to address expenses associated with his mother's estate, including grave-related expenses, and impaired his ability to meet financial obligations to family members.

118. Plaintiff further suffered emotional distress from the criminal prosecution, detention, denial of requested medical attention, exclusion from Chase branches, continued communications from Chase after he obtained counsel, and the continuing consequences of the April 14, 2023 incident.

119. The injuries and damages described above resulted from the acts and omissions of the respective Defendants as more specifically alleged in the Counts below.

## COUNT I

BREACH OF CONTRACT

Against Defendant JPMorgan Chase Bank, N.A.

120. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

121. At all relevant times, Plaintiff maintained deposit accounts with Defendant JPMorgan Chase Bank, N.A. ("Chase"), including a personal checking account Plaintiff had maintained since approximately 2007 and the joint checking account opened on April 5, 2023.

122. Plaintiff's deposit accounts were governed by Chase's Deposit Account Agreement ("DAA"), effective March 19, 2023. The DAA expressly provides that it is the contract governing Chase deposit accounts and defines an "Account" as any covered deposit account maintained with Chase.

123. Plaintiff performed his obligations under the DAA, including providing Chase with identification and information requested in connection with the accounts, depositing lawful funds, and repeatedly cooperating with Chase's requests concerning the seven checks deposited on April 5, 2023.

124. When Chase requested telephone numbers for the check issuers, Plaintiff provided them. On April 14, 2023, Plaintiff supplied the remaining numbers, offered Chase a live telephone call with Marie Guerrier when Chase rejected the telephone number Plaintiff provided for her, and ultimately proposed that Chase exclude or void Guerrier's approximately $200 check while releasing the remainder of the funds.

Contractual Provisions Governing Chase's Authority

125. Section III(A)(5) of the DAA, entitled "Our right to charge back deposited or cashed items," permits Chase to subtract funds when, among other circumstances, a deposited item is returned unpaid, the paying bank or issuer demands repayment because the item was altered, forged, unauthorized, or defective, or Chase has reason to believe that such an event has occurred or may occur.

126. Section III(A)(5) further permits Chase, where it has reason to believe a deposited item should not have been paid or may not be paid, to place a hold on the funds or move them to a non-customer account while determining who is entitled to them.

127. Section IX(C), entitled "Restricting Your Account; Blocking or Delaying Transactions," permits Chase under identified circumstances to decline or prevent transactions to or from an account, freeze or delay particular withdrawals, payments, or transfers, and remove funds from an account to hold them pending investigation.

128. Section IX(C) separately provides that Chase may limit "cash deposits to, or withdrawals from, your account (or all of your accounts collectively)" during a period of time to reduce risk or enhance compliance with applicable law.

129. Section IX(C) further permits restrictions when Chase "reasonably believe[s]" that doing so is necessary to avoid a loss or reduce risk to Chase.

130. Section IX(B), entitled "General Liability," expressly provides that contractual limitations on Chase's liability do not negate any duty imposed by applicable law to act in good faith and with reasonable care.

131. Section IX(H), entitled "Adverse Claims," addresses circumstances involving conflicting instructions or disputes regarding entitlement to an account or its funds and permits Chase to withhold funds while competing claims are resolved.

132. Chase's Funds Availability Policy separately distinguishes cash deposits from check deposits. For Plaintiff's type of account, cash deposits are ordinarily available on the day Chase receives them, while check deposits are governed by separate availability and extended-hold provisions.

133. Plaintiff does not allege that the DAA prohibited Chase from investigating suspicious transactions, temporarily restricting funds genuinely implicated in such an investigation, refusing a deposit, charging back a qualifying deposited item, or declining to close an account while contractually recognized pending transactions or holds remained.

134. Plaintiff instead alleges that Chase exercised the discretionary powers granted by the DAA beyond the scope of the particular contractual provisions upon which Chase relied.

First Breach — Complete Restriction of Plaintiff's Separate Personal Account

135. Beginning on April 7, 2023, Chase restricted not only the newly opened joint account into which the April 5 deposits had been made, but also Plaintiff's separate personal checking account, which Plaintiff had maintained with Chase since approximately 2007.

136. The transactions Chase represented that it was investigating arose from the seven checks deposited into the newly opened joint account. None of those checks was deposited into Plaintiff's longstanding personal account.

137. Chase subsequently represented in communications concerning the dispute that the restrictions arose from its efforts to verify issuance of the deposited check or checks. Chase did not identify any questioned check, deposit, adverse claim, conflicting ownership instruction, legal process, fraudulent transaction, or suspicious activity originating from Plaintiff's longstanding personal account.

138. Section IX(C) repeatedly refers to restrictions imposed upon "your account," while separately and expressly authorizing certain limitations upon cash deposits to or withdrawals from "your account (or all of your accounts collectively)."

139. The DAA's express use of the broader phrase "all of your accounts collectively" demonstrates that the Agreement distinguishes between authority directed to a particular account and specifically identified authority extending across multiple accounts.

140. Chase did not merely impose a limitation upon cash withdrawals across Plaintiff's accounts. It completely restricted Plaintiff's ability to access and transact upon his separate personal checking account because of an investigation concerning deposits made into a different account.

141. The restriction therefore went beyond the narrower cross-account authority expressly identified in § IX(C) concerning limitations upon "cash deposits to, or withdrawals from" multiple accounts collectively.

142. To the extent Chase relies upon § IX(C)'s authority to restrict an account when Chase "reasonably believe[s]" such action necessary to avoid loss or reduce risk, Chase did not identify any facts connecting the disputed approximately $200 Guerrier check, or any other questioned joint-account deposit, to Plaintiff's longstanding personal account.

143. Chase did not identify any actual or threatened loss arising from Plaintiff's personal account that made a complete restriction of that separate account reasonably necessary.

144. Chase therefore exercised its contractual discretion beyond the identified purpose and scope of the provision it invoked by subjecting an unrelated account to a complete restriction without an identified contractual predicate applicable to that account.

145. To the extent Chase contends that any account-number change or internal transfer justified Plaintiff's loss of access, § IX(C) provides that Chase may assign account information and documentation to a replacement account number, but further provides that the DAA continues to govern the account "without interruption" as though the discontinued number had been retained.

146. Plaintiff nevertheless lost access to and use of the funds associated with his personal account during the restriction period.

147. Chase thereby breached the DAA by extending a joint-account check investigation to Plaintiff's separate personal account without an identified contractual basis applicable to that account and by depriving Plaintiff of access to funds unrelated to the questioned deposit.

Second Breach — Removal and Withholding of Cash and Other Funds Beyond the Identified Check Investigation

148. Chase committed a separate and independent breach concerning the funds deposited into the joint account on April 5, 2023.

149. Plaintiff deposited a total of $10,428 into the joint account, consisting of $8,028 in cash and $2,400 in seven checks. None of the seven checks exceeded $500.

150. The $8,028 cash deposit was counted and accepted by Chase on April 5, 2023.

151. Chase never informed Plaintiff that the cash itself was counterfeit, fraudulent, subject to an adverse claim, connected to illegal activity, misposted, deposited in error, or otherwise disputed.

152. Chase's repeatedly stated verification concerns instead focused upon the checks deposited into the joint account.

153. By April 14, 2023, Chase's unresolved verification demand centered specifically upon Marie Guerrier's approximately $200 check.

154. Plaintiff provided Chase with Guerrier's telephone number, offered to place Guerrier on a live telephone call with Chase, explained that Guerrier had limited mobility, and ultimately proposed that Chase exclude or void Guerrier's approximately $200 check while releasing the remainder of the funds.

155. Chase refused.

156. Section III(A)(5) expressly addresses Chase's authority concerning returned, questioned, unauthorized, or potentially unpaid deposited items and permits Chase to hold funds where it has reason to believe such an event has occurred or may occur.

157. Plaintiff does not challenge Chase's authority to place a legitimate hold upon the proceeds of a questioned check while conducting a contractually authorized investigation.

158. Plaintiff instead alleges that Chase exceeded the scope of that contractual authority by removing or withholding substantially more than the funds attributable to the identified risk.

159. The specific unresolved check identified by Chase was approximately $200. All seven deposited checks together totaled only $2,400. Yet Chase's account records reflected removal or withholding affecting the entire $10,428 deposit, including the separately deposited $8,028 in cash.

160. The DAA's separate treatment of check charge-backs, investigative holds, and cash availability demonstrates that funds derived from a questioned check and cash independently deposited into the account are not contractually interchangeable for every purpose.

161. Section IX(C)'s authority to remove funds "pending investigation" does not eliminate the requirement that Chase's exercise of contractual discretion bear a reasonable relationship to the investigation or risk for which that discretion was granted.

162. To the extent Chase relies upon § IX(C)'s provision permitting restrictions where Chase "reasonably believe[s]" such action necessary to avoid loss or reduce risk, Chase did not

identify a risk concerning the $8,028 cash deposit itself that reasonably required removal or withholding of that cash because of an unresolved approximately $200 check.

163. Nor did § IX(H), concerning adverse claims, supply an independent basis for withholding Plaintiff's cash. No check issuer, joint owner, third party, court, or government agency asserted a competing ownership claim to Plaintiff's $8,028 cash deposit.

164. Plaintiff was never informed that any issuer had reported any deposited check forged or unauthorized. Plaintiff instead repeatedly supplied issuer contact information and attempted to facilitate Chase's verification.

165. On April 14, 2023, Plaintiff asked Abdullah why, if Chase had already obtained the deposited check funds from the issuers' banks approximately nine days earlier, Chase had neither made those funds available to Plaintiff nor returned them to the issuers. Abdullah did not answer that question.

166. On or about April 19, 2023, Chase sent Plaintiff an electronic communication reflecting a balance of $0.00 or below an approved limit, and Chase's ledger reflected removal of funds from the joint account.

167. That removal was not limited to Guerrier's approximately $200 check or even to the $2,400 represented by all seven checks, but affected the separately deposited cash as well.

168. Chase subsequently re-credited funds on or about April 20, 2023.

169. The subsequent re-credit did not eliminate the completed deprivation or restore Plaintiff's immediate practical access to his funds because Chase did not contemporaneously notify Plaintiff in a manner that enabled him to access the money, Plaintiff remained restricted from the banking relationship, and Plaintiff had been barred from entering Chase branches following the April 14 incident.

170. Plaintiff did not safely regain practical access to the banking relationship until June 8, 2023, when he returned to Chase accompanied by counsel.

## Good Faith and Exercise of Contractual Discretion

171. Plaintiff does not invoke the covenant of good faith and fair dealing to override Chase's express contractual authority to investigate transactions, restrict accounts, refuse deposits, charge back qualifying items, or impose legitimate investigative holds.

172. Rather, Plaintiff's good-faith allegations are anchored directly to Chase's exercise of the contractual discretion granted by §§ III(A)(5) and IX(C), including whether Chase exercised that discretion for the purposes identified in those provisions and within the limits imposed by their terms.

173. Section IX(B) expressly recognizes that contractual limitations on Chase's liability do not negate any applicable duty to act in good faith and with reasonable care.

174. Chase's discretionary authority under the DAA therefore did not permit it to invoke an identified check-verification investigation as an unlimited basis to restrict unrelated accounts or withhold unrelated funds without a reasonable contractual connection to the risk being investigated.

**Breach, Causation, and Damages**

175. Chase's conduct constituted two separate breaches of the DAA:

a. extending a check-related investigation concerning deposits into the joint account to Plaintiff's separate longstanding personal account and completely restricting that account without an identified contractual predicate applicable to it; and

b. removing or withholding the entire $10,428 joint-account deposit, including $8,028 in separately deposited cash, where Chase's identified unresolved verification issue concerned an approximately $200 check and Chase did not identify a contractual basis connecting the cash itself to the suspected risk.

176. These breaches are distinct from Plaintiff's prior allegation that Chase possessed no contractual authority whatsoever to restrict an account or investigate a deposit. Plaintiff acknowledges Chase's express contractual authority and alleges that Chase exceeded the scope and purpose of that authority in the specific respects identified above.

177. Plaintiff's April 14 request that Chase close his accounts is alleged as part of the factual sequence and not as a separate contractual breach based merely upon Chase's refusal to close an account while a contractually recognized hold or pending transaction remained.

178. As a direct result of Chase's breaches, Plaintiff was deprived of the use and benefit of funds that were not themselves shown to be subject to the identified check-verification issue.

179. Plaintiff suffered direct financial injury, including loss of use of his funds during the restriction period and delay in his ability to use those funds for personal, family, funeral, and estate-related obligations arising after his mother's death.

180. Plaintiff seeks recovery of direct contract damages proven at trial, prejudgment interest, and all other relief recoverable under Pennsylvania law and the DAA.

COUNT II

INTENTIONAL RACE DISCRIMINATION IN THE MAKING AND ENFORCEMENT OF CONTRACTS

42 U.S.C. § 1981

Against Defendant JPMorgan Chase Bank, N.A.

181. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

182. Plaintiff is Black and is a member of a racial group protected by 42 U.S.C. § 1981. Plaintiff is also of Haitian ancestry. Plaintiff does not assert this claim solely on the basis of national origin or accent.

183. Plaintiff maintained an approximately fifteen-year contractual banking relationship with Chase and, on April 5, 2023, entered an additional contractual relationship with Chase through the newly opened joint account.

184. Section 1981 protects Plaintiff's right to make and enforce those contracts on the same terms as white citizens, including their performance, modification, termination, and enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

Plaintiff's Treatment by Chase

185. As alleged above, Chase subjected Plaintiff to escalating scrutiny after accepting his $10,428 deposit, including restricting his unrelated longstanding personal account; repeatedly demanding issuer information; rejecting the telephone number supplied for Marie Guerrier; requiring the mobility-impaired Guerrier to appear personally at a Chase branch; refusing live telephone verification; and refusing Plaintiff's proposal to exclude or void Guerrier's approximately $200 check while releasing funds unrelated to that check.

186. On the morning of April 14, 2023, Plaintiff expressly informed Chase corporate representative Maria that the escalating scrutiny felt discriminatory. Chase nevertheless continued the challenging treatment.

187. Later that same day, after approximately two hours at the 1100 Market Street branch attempting to resolve the matter, Plaintiff again complained of discrimination, this time directly to Abdullah, explaining that as an approximately fifteen-year Chase customer he believed the ordeal and extraordinary scrutiny were discriminatory.

188. Abdullah dismissed Plaintiff's complaint by telling him, in substance, that he could call Chase corporate and make a complaint. After Plaintiff questioned the disposition of his funds, Abdullah instructed him to leave, notwithstanding Brito's express reassurance less than

approximately ten minutes earlier that Plaintiff could remain while Chase attempted to resolve the matter.

189. The encounter then rapidly escalated through Chase's uniformed constable to law enforcement. As alleged above, Chase personnel thereafter characterized Plaintiff as abusive, disruptive in Chase's internal memo and belligerent, or persistently noncompliant to the police in respects Plaintiff alleges are contradicted by the chronology and body-worn-camera evidence.

190. Abdullah subsequently described Plaintiff to law enforcement as, among other things, a "black" male "with an accent." Plaintiff does not allege that identifying his race in a physical description, standing alone, establishes discrimination. The statement is alleged only as part of the total circumstances bearing upon Chase's treatment of Plaintiff and discriminatory intent.

## Corroborative Evidence of Discrimination in Deposit Banking

191. Plaintiff does not rely upon a conclusory allegation that unidentified similarly situated customers were treated differently. Plaintiff instead relies upon his own specific factual allegations together with documented complaints, civil-rights litigation, and scholarly analysis concerning racial discrimination in deposit banking, including evidence specifically concerning Chase.

192. In 2025, Mark B. Greenlee published *Color in Line: Discrimination Against People of Color at the Deposit Window*, 29 N.C. Banking Inst. 102 (2025). Greenlee analyzed CFPB consumer complaints alleging discrimination on the basis of race, color, ethnicity, and national origin involving checking and savings accounts, check cashing, and money services.

193. Greenlee searched CFPB consumer-complaint narratives from 2015 through 2024 and identified 531 complaints alleging racial, ethnic, minority, or national-origin discrimination in checking or savings accounts, check cashing, or money-service transactions. Of those complaints, 413, or approximately 78%, expressly mentioned race or color.

194. Greenlee further found that the most frequently alleged discriminatory conduct involved account closures and holds on, or lack of access to, funds. Of the 531 responsive complaints, 141 involved account closures and 122 involved holds on or lack of access to funds in checking or savings accounts.

195. Of those 531 responsive complaints, 366, or approximately 70%, were attributable to the ten largest domestic banking organizations. Greenlee identified JPMorgan Chase as the institution with the highest number of responsive complaints—99—followed by Bank of America with 73 and Wells Fargo with 67.

196. Greenlee cautioned that publicly available CFPB narratives ordinarily present only the consumer's side of the dispute and that detailed company responses are generally unavailable. Plaintiff therefore does not allege that the CFPB complaints themselves establish liability, but cites them as documented allegations relevant to the plausibility and context of the conduct alleged here.

### Chase-Specific CFPB Complaints Predating Plaintiff's Incident

197. Greenlee identified a March 12, 2021 CFPB complaint against JPMorgan Chase, Complaint No. 4208050, in which a consumer alleged that Chase discriminated against him on the basis of his identity and froze an account containing his personal money and employment direct deposits.

198. That complaint is relevant to Plaintiff's allegations because Plaintiff likewise alleges that Chase imposed restrictions not only on the newly opened account containing the questioned deposits, but also on his separate longstanding personal account containing unrelated funds.

199. Greenlee also identified CFPB Complaint No. 5462730, filed April 18, 2022, involving a Chase customer who alleged that he was racially profiled while attempting to open an additional business checking account. According to the complaint, a Chase employee became visibly aggravated, raised her voice, refused his request to speak with a branch manager, ordered him to leave, threatened to call police when he refused to leave because of the treatment, and Chase later closed his business and personal accounts.

200. The 2022 complaint bears material similarities to Plaintiff's allegations because it involved a Chase customer alleging racial profiling, escalation from a banking dispute to an instruction to leave, threatened police involvement, and consequences extending across multiple Chase accounts.

201. Greenlee separately found that numerous CFPB complaints alleged calls to police or threats to call police when people of color attempted to engage in legitimate deposit and check-cashing transactions. Greenlee described those allegations as particularly troubling where bank personnel used police involvement against customers of color.

### Additional Chase-Specific Civil-Rights Allegations

202. In 2010, Ikenna Njoku, a Black Chase customer in Washington State, attempted to cash an $8,463.21 cashier's check that Chase itself had issued to him after receiving his federal first-time-homebuyer tax rebate. According to contemporaneous reports, Chase personnel questioned Njoku about the check and his occupation, regarded the check as fraudulent, and

caused police to arrest him for suspected check fraud. Chase subsequently determined that the check was valid and publicly apologized for what occurred.

203. The Njoku incident is relevant not because Plaintiff alleges that every circumstance was identical, but because it involved Chase personnel subjecting a Black customer presenting legitimate funds to heightened suspicion concerning the legitimacy of a check, followed by escalation to law enforcement and arrest when the underlying transaction was legitimate.

204. Greenlee's article also identifies civil-rights litigation involving Chase, including *Mitchell-Stewart v. JPMorgan Chase & Co.*, No. 4:22-cv-00341 (S.D. Tex.), among representative § 1981 banking cases.

205. As alleged in that action, Dr. Malika Mitchell-Stewart, a Black physician, contended that Chase personnel questioned the legitimacy of an approximately $16,000 employment check and questioned whether she was actually employed as a physician when she attempted to open an account and deposit the check.

206. Plaintiff alleges the Mitchell-Stewart episode not as proof of liability in this case, but as additional Chase-specific context concerning allegations that Black customers presenting legitimate checks have been subjected to heightened suspicion concerning the legitimacy of their funds.

207. Greenlee also discusses *Vaughn v. JPMorgan Chase & Co.*, in which a Black Chase customer alleged that a branch manager treated her with hostility, ordered her to leave, threatened police involvement, and then called police while she was attempting to use Chase banking services.

208. According to Greenlee's description of that litigation, the branch manager claimed the customer had been "rude" and told her, "You're not welcome here," while a responding officer stated that being rude in a bank was not a law-enforcement matter.

## Congressional Notice and Chase's Awareness of the Issue

209. Before Plaintiff's April 2023 encounter, racial discrimination in banking had also been addressed publicly before the United States Senate.

210. At a September 22, 2022 hearing of the Senate Committee on Banking, Housing, and Urban Affairs, Senator Sherrod Brown asked the chief executives of the nation's largest banks whether they were committed to fighting discrimination and whether they supported legislation prohibiting discrimination in financial services. JPMorgan Chase Chairman and CEO Jamie Dimon stated that Chase supported the same anti-discrimination principles identified by the other bank executives.

211. The significance of that evidence is not that congressional questioning proves discrimination in Plaintiff's case. Rather, it demonstrates that racial discrimination in access to ordinary financial services was a recognized issue presented directly to Chase's highest leadership before Plaintiff's April 2023 encounter.

212. Greenlee further notes that in 2019, following public reporting of discrimination at Chase branches, Jamie Dimon issued a memorandum to Chase employees stating that racism, whether "explicit or veiled, deliberate or unconscious," was unacceptable and inconsistent with how Chase served customers.

213. Chase has also publicly stated that discrimination, harassment, and inappropriate conduct are not tolerated against customers or other persons conducting business with Chase.

## Reasonable Inference of Intentional Racial Discrimination

214. Plaintiff does not allege that Greenlee's study, the CFPB complaints, Njoku's incident, the Mitchell-Stewart litigation, the Vaughn litigation, or congressional scrutiny independently establishes that the Chase employees involved in Plaintiff's encounter acted because of race.

215. Nor does Plaintiff rely upon those episodes as strict one-to-one comparators.

216. Rather, those materials provide corroborative context for determining whether Plaintiff's own detailed allegations plausibly reflect racial discrimination rather than merely poor customer service or an ordinary fraud-prevention investigation.

217. Plaintiff's own allegations include that Chase restricted an unrelated approximately fifteen-year-old personal account; repeatedly escalated verification requirements; rejected the telephone number supplied for Guerrier; refused live verification; required a mobility-impaired issuer to appear personally; refused to segregate an approximately $200 questioned check from substantially larger undisputed funds; and continued the challenged treatment after Plaintiff twice expressly stated that he believed it was discriminatory.

218. The second discrimination complaint was made directly to Abdullah at the branch. Rather than address the concern, Abdullah dismissed it, directed Plaintiff to complain to corporate, and shortly thereafter instructed Plaintiff to leave, after which Chase security became physically involved and police were summoned.

219. Chase personnel thereafter characterized Plaintiff as abusive, disruptive, belligerent, or persistently noncompliant in respects Plaintiff alleges are inconsistent with the objective chronology and body-worn-camera evidence.

220. The similarity between Plaintiff's allegations and preexisting Chase-related complaints identified by Greenlee—including account freezes involving personal funds, cross-account consequences, instructions to leave following claims of discriminatory treatment, threats of

police involvement, and police escalation—provides additional circumstantial support for the plausibility of Plaintiff's claim.

221. Viewed collectively, Plaintiff alleges facts sufficient to support a reasonable inference that the heightened suspicion, escalating verification demands, restriction of unrelated funds, adverse characterization, and security escalation he experienced were influenced by race and were not merely the neutral application of ordinary banking procedures.

Interference With Rights Protected by § 1981

222. Chase's conduct concerned rights protected by § 1981 because it interfered with the performance, enforcement, enjoyment, and termination of Plaintiff's existing contractual banking relationships.

223. Chase's conduct interfered with Plaintiff's ability to access and use his accounts, obtain ordinary banking assistance concerning his funds, resolve account restrictions, enjoy the benefits and privileges of his longstanding banking relationship, and terminate that relationship in an orderly manner.

224. Unlike circumstances in which a banking customer ultimately receives the service sought after only delay or inconvenience, Plaintiff alleges that he was not permitted to complete the banking transaction he sought to complete on April 14, was physically removed from the branch, arrested, barred from Chase branches, and remained unable to safely access the banking relationship until returning with counsel.

225. Plaintiff alleges that, but for his race, he would not have been subjected to the cumulative and escalating course of treatment described above and would not have suffered the resulting interference with his contractual rights.

226. Race need not have been the sole consideration underlying every challenged act. Plaintiff alleges that race was a but-for cause of the deprivation of his right to make and enforce contracts on the same terms and with the same benefits and privileges afforded to white citizens.

227. Chase acted through its employees and agents while those persons were performing banking, managerial, customer-service, and security functions within the scope of their employment or agency.

228. As a direct and proximate result of Chase's violation of § 1981, Plaintiff suffered financial injury, loss of the use and enjoyment of his contractual banking relationship, humiliation, emotional distress, reputational injury, and other damages to be established through discovery and proven at trial.

229. Chase's conduct was intentional and, to the extent established through discovery and proven at trial, was undertaken with reckless or callous disregard for Plaintiff's federally protected right to make and enforce contracts without racial discrimination.

COUNT III

FALSE ARREST AND FALSE IMPRISONMENT

42 U.S.C. § 1983 — FOURTH AMENDMENT / MONELL

Against Defendant City of Philadelphia

230. Plaintiff incorporates by reference all preceding factual allegations as though fully set forth herein.

231. Plaintiff was seized, arrested for defiant trespass, and thereafter detained for approximately fourteen hours.

232. As alleged above, immediately before Abdullah instructed Plaintiff to leave, Brito had expressly reassured Plaintiff that he could remain in Brito's office while Chase attempted to resolve the disposition of Plaintiff's funds. Brito never withdrew that permission or instructed Plaintiff to leave.

233. Abdullah did not identify herself to Plaintiff as Brito's supervisor, branch manager, or a person possessing authority superior to Brito concerning Plaintiff's continued presence.

234. When the Chase constable told Plaintiff he was going to be arrested, Plaintiff responded, "I don't wanna be here. I will leave as soon as I get my money."

235. Upon Officer Curtosi's arrival, Plaintiff attempted to engage him regarding the situation. Curtosi did not meaningfully inquire into Plaintiff's explanation, Brito's permission, or the conflicting circumstances concerning Plaintiff's authority to remain and instead stated that he was there to take Plaintiff to jail.

236. The responding officers did not meaningfully mediate the dispute or independently determine whether the circumstances established that Plaintiff knowingly remained without license or privilege before physically seizing him.

237. After participating in Plaintiff's seizure and the use of force, Officer Leonard asked, "What's he getting locked up for?" Curtosi responded, "Trespass. Defiant trespass." Leonard had therefore participated in Plaintiff's seizure without having been informed of the offense underlying the arrest.

238. The supervising sergeant likewise did not independently confirm with Abdullah—the Chase employee who had instructed Plaintiff to leave—whether Plaintiff had been directed to

leave, the circumstances surrounding that instruction, or whether Brito's prior permission had been withdrawn. Instead, the sergeant relied upon Curtosi concerning the basis for the arrest and permitted the arrest to proceed.

239. These circumstances support Plaintiff's allegation that the officers proceeded with a custodial arrest without an adequate independent investigation of facts readily available at the scene bearing directly upon probable cause.

240. Plaintiff was thereby arrested and imprisoned without probable cause in violation of the Fourth Amendment.

## Municipal Notice, Policy, Custom, and Deliberate Indifference

241. Plaintiff does not seek to impose liability upon the City merely because it employed the responding officers. The constitutional violation resulted from the City's longstanding notice of deficiencies concerning unlawful seizures and complaint-driven arrests, coupled with its failure adequately to enforce, train, supervise, and discipline officers regarding independent probable-cause determinations.

242. The City had actual notice of the particular danger presented by police responses to requests by private businesses to arrest customers for defiant trespass no later than April 12, 2018, when Philadelphia police arrested Donte Robinson and Rashon Nelson at a Philadelphia Starbucks after store personnel requested their removal.

243. Following those arrests, the City and PPD reviewed their practices and adopted **Police Commissioner's Memorandum 18-02, "Defiant Trespass," effective June 8, 2018**, specifically governing defiant-trespass arrests on private business property open to the public.

244. Commissioner's Memorandum 18-02 expressly recognized that such arrests are "complaint driven" by business owners or other authorized persons and warned of the need to avoid the "**misuse of police authority by business owners**" and the appearance of impropriety by responding officers.

245. To address that known danger, Memorandum 18-02 required officers, before making and processing a misdemeanor defiant-trespass arrest at a business open to the public, to attempt to de-escalate and mediate the dispute and required supervisory involvement before arrest.

246. The City publicly explained that the policy was adopted in response to the Starbucks incident to provide officers clearer guidance and greater discretion, produce fewer unnecessary arrests, and prevent officers from being placed in untenable situations at the behest of retailers.

247. Those safeguards were subsequently incorporated into **PPD Directive 3.6**, governing defiant-trespass enforcement. Directive 3.6 required supervisory evaluation of the available facts and circumstances and authorized the responding supervisor to decline an arrest where

the circumstances reasonably indicated that a business owner or authorized person was attempting to misuse police enforcement authority.

248. Thus, years before Plaintiff's April 14, 2023 arrest, Philadelphia policymakers expressly recognized the precise constitutional danger presented when police respond to a private business's request to arrest a customer for defiant trespass: officers must independently assess the circumstances rather than mechanically convert the business's request into a custodial arrest.

249. The City's notice was not limited to the Starbucks incident. Before Plaintiff's arrest, Philadelphia's civilian police-oversight bodies had repeatedly identified deficiencies concerning constitutional stops, detentions, investigations, supervision, and accountability.

250. In 2021, the Police Advisory Commission ("PAC"), predecessor to the Citizens Police Oversight Commission ("CPOC"), reviewed PPD's pedestrian-investigation policies and identified deficiencies requiring clearer guidance concerning reasonable suspicion and probable cause, including the requirement that persons be released when the constitutional justification for detention dissipates.

251. A separate 2021 collaborative review conducted by PAC and PPD examined approximately 9,000 allegations arising from more than 3,500 civilian complaints against Philadelphia police officers from 2015 through 2020. The review found that approximately 86% of allegations did not advance beyond the initial investigation; where Internal Affairs found evidence of misconduct, approximately 76% resulted only in training or counseling rather than discipline; and only approximately 0.5% of civilian allegations resulted in a recorded consequence beyond a reprimand.

252. The City's own oversight history therefore documented substantial deficiencies in the investigation and discipline of alleged officer misconduct before Plaintiff's arrest. Contemporary analysis of Philadelphia's accountability system likewise reported that approximately 99.5% of civilian complaints resulted in no discipline.

253. The City had also been repeatedly exposed to civil claims alleging unconstitutional arrests, searches, and prosecutions. Publicly reported City data showed that more than 900 police-misconduct claims were filed against Philadelphia between fiscal years 2016 and 2022, with false arrest, illegal searches, excessive force, and malicious prosecution among the most common categories.

254. Philadelphia paid approximately $116 million to resolve police-misconduct claims between fiscal years 2016 and 2022, further placing policymakers on notice of recurring allegations of unconstitutional police conduct.

255. Federal litigation predating Plaintiff's arrest likewise placed the City on notice of allegations that Philadelphia officers arrested and detained persons without probable cause. In *McCall v.*

*City of Philadelphia*, plaintiffs alleged a City pattern or practice of subjecting citizens to arrest, search, and prosecution without probable cause. Although the court found the particular Monell allegations there insufficiently pleaded, the litigation itself was among the sources notifying the City of allegations concerning unconstitutional arrests and inadequate probable-cause determinations.

256. The significance of these prior complaints, litigation, settlements, and oversight findings is not that every prior incident was identical to Plaintiff's arrest. Rather, they demonstrate that before April 14, 2023, Philadelphia policymakers had repeatedly been confronted with allegations and institutional findings concerning unconstitutional seizures, deficient investigations, inadequate supervision, and ineffective discipline.

257. Most significantly, the 2018 Starbucks incident, Commissioner's Memorandum 18-02, and Directive 3.6 provided notice concerning the **same particular category of encounter presented here**—a private business open to the public requesting police enforcement against a customer for alleged defiant trespass.

258. Notwithstanding that notice and the City's written safeguards, the officers responding to Chase did precisely what those safeguards were designed to prevent: they failed to meaningfully mediate the underlying business dispute, failed to investigate readily available conflicting information bearing upon Plaintiff's license or privilege to remain, and proceeded with a custodial arrest based substantially upon the business's demand for Plaintiff's removal.

259. The supervisory safeguard likewise failed in practice. Although a sergeant responded, he did not independently question Abdullah concerning her instruction to Plaintiff, determine whether Brito's recent permission remained operative, or meaningfully resolve the conflicting circumstances before permitting the arrest to proceed.

260. Leonard's participation further demonstrates the inadequacy of the City's practices as applied at the scene: he participated in Plaintiff's seizure and force before asking what offense Plaintiff was being arrested for.

261. The simultaneous failures of the arresting officer, participating officers, and responding supervisor permit a reasonable inference that Plaintiff's injury resulted not merely from an isolated mistake by one officer, but from inadequate implementation, training, supervision, and enforcement of the City's established constitutional safeguards.

262. The City's own disciplinary data and oversight findings further support Plaintiff's allegation that inadequate investigation and minimal consequences for officer misconduct reduced the deterrent effect of written policies and permitted unconstitutional practices to persist.

263. Despite actual notice of these risks, the City failed adequately to ensure that officers and supervisors responding to complaint-driven defiant-trespass calls meaningfully applied

Commissioner's Memorandum 18-02 and Directive 3.6 by independently assessing probable cause, mediating conflicting accounts, and declining arrest when the available circumstances did not establish a lawful basis for custodial seizure.

264. The City's failure adequately to train, supervise, discipline, and enforce these known safeguards constituted deliberate indifference to the foreseeable constitutional rights of persons subjected to complaint-driven arrests.

265. There was a direct causal and affirmative link between those municipal deficiencies and Plaintiff's injury. Had the City's known safeguards been meaningfully implemented and enforced, the officers would have investigated Brito's express permission, Abdullah's subsequent contrary instruction, Plaintiff's explanation, and the unresolved banking dispute before arresting Plaintiff.

266. Instead, the known risk that prompted Philadelphia to adopt Commissioner's Memorandum 18-02 materialized again: police authority was used to convert an unresolved dispute between a customer and a private business into a custodial defiant-trespass arrest without an adequate independent probable-cause determination.

267. The City's customs and deliberately indifferent failures in training, supervision, discipline, and enforcement were therefore a moving force behind Plaintiff's unlawful arrest and resulting detention.

268. As a direct and proximate result, Plaintiff suffered loss of liberty, physical injury, humiliation, emotional distress, reputational injury, financial loss, and other damages to be established through discovery and proven at trial.

## COUNT IV

## JOINT ACTION / DEPRIVATION OF FOURTH AMENDMENT RIGHTS

## 42 U.S.C. § 1983

**Against JPMorgan Chase Bank, N.A., City of Philadelphia, Mecca Abdullah, Chase Constable, Curtosi, Leonard, and Participating Officers**

269. Plaintiff incorporates all preceding allegations and does not repeat them herein.

270. This Count replaces the former § 1985(3) conspiracy claim. Plaintiff does not rely merely upon Chase contacting police, parallel conduct, or the number of responding officers—the allegations the Court previously found insufficient.

271. Plaintiff instead alleges joint action under § 1983 based upon the direct and contemporaneous participation of Chase representatives and Philadelphia police officers in the same alleged unconstitutional seizure.

272. Abdullah and the uniformed constable were acting on behalf of Chase in connection with branch operations and security. Curtosi, Leonard, the supervising sergeant, and participating Philadelphia police officers were acting under color of state law and within their functions as City police officers.

273. Before police arrived, Plaintiff had presented valid identification to Chase personnel, including his New York State Driver's License and multiple Chase-issued bank cards, which Chase personnel had seen and accepted while addressing Plaintiff's restricted accounts.

274. Notwithstanding that identification, Chase personnel subsequently represented to police that Plaintiff lacked proper verification and that he had refused approximately ten requests to leave over the course of approximately one hour.

275. Plaintiff alleges those representations were materially false. Chase personnel had already verified Plaintiff's identity, and the time-stamped chronology reflects that the first instruction to leave occurred at approximately 5:39 p.m. and police were summoned approximately five minutes later, making ten requests over the preceding hour inconsistent with the contemporaneous chronology.

276. When Curtosi arrived, Plaintiff attempted to address him concerning the circumstances. Curtosi did not meaningfully engage Plaintiff or inquire into his explanation and instead stated that he was there to take Plaintiff to jail.

277. Plaintiff did not provide his passport or driver's license to the responding officers, nor did the officers request identification directly from Plaintiff. Instead, officers accessed Plaintiff's backpack without his consent, retrieved his passport and/or driver's license, and used those documents for identification purposes.

278. The officers therefore proceeded with Plaintiff's seizure without meaningfully resolving the readily available discrepancies concerning Plaintiff's identity, his permission to remain, the number and timing of requests to leave, and the circumstances reported by Chase personnel.

279. At the same time, Chase's constable crossed the line from private complainant or security observer to direct participant in governmental action. Before Philadelphia police arrived, the constable threatened Plaintiff with arrest and attempted to physically pull Plaintiff from his chair.

280. After police arrived, the constable physically joined Curtosi and the responding officers in Plaintiff's seizure, restraint, movement, and detention; assisted in moving Plaintiff toward the reception area; retrieved Plaintiff's backpack and carried it to that area; and remained alongside the officers during the restraint and use of force.

281. Curtosi's acknowledgment of the constable's assistance further corroborates that the constable was participating with the officers rather than merely observing their conduct.

282. Plaintiff therefore does not base joint action merely upon Chase furnishing information or requesting police assistance. Chase representatives allegedly supplied materially false information bearing directly upon the asserted trespass while Chase's uniformed security representative personally participated with Philadelphia police in the same continuous seizure and arrest.

283. The combination of Chase's information to police, the constable's attempted seizure before police arrived, the constable's subsequent physical cooperation with Curtosi and other officers, and the officers' implementation of Chase's requested removal supports a reasonable inference that the private and governmental actors were willful participants in joint activity resulting in Plaintiff's seizure and arrest.

284. Plaintiff therefore alleges that the constable became a willful participant in state action and acted under color of state law for purposes of § 1983.

285. Plaintiff alternatively alleges that the constable's status as a Pennsylvania State Constable, appearance in full official uniform, and exercise of governmental coercive authority independently support state-action treatment.

Chase Institutional Liability

286. Chase is not alleged liable merely because Abdullah and the constable acted as its representatives. Plaintiff alleges that their actions occurred while performing the branch-management and security functions Chase entrusted to them and pursuant to Chase's arrangements, practices, authorization, or customs governing the use of constables or law-enforcement personnel to enforce Chase directives against customers.

287. Chase, through Abdullah, invoked its security apparatus to remove Plaintiff while its uniformed constable exercised coercive authority against Plaintiff before police arrived and thereafter participated directly with Philadelphia police in the seizure.

288. The allegedly false information supplied by Chase concerning Plaintiff's identification and the purported number and duration of requests to leave was not collateral to the police encounter; it concerned facts directly relevant to Chase's demand that Plaintiff be treated as a trespasser and removed from the premises.

289. Plaintiff alleges that Chase's policy, custom, practice, authorization, or security arrangement permitting its representatives to employ persons possessing governmental authority to detain or physically remove customers, and to act jointly with responding police in doing so, caused or facilitated the constitutional deprivation alleged herein.

290. The precise contractual relationship, instructions, training, authority, communications, and policies governing Chase's use of the constable are principally within Chase's possession and are appropriate subjects of discovery.

## City Institutional Liability

291. The City likewise is not alleged liable merely because it employed Curtosi, Leonard, the supervising sergeant, and participating officers.

292. As more fully alleged in Counts III and IX, before April 14, 2023, Philadelphia had expressly recognized the danger that police authority could be misused at the behest of private businesses seeking Defiant Trespass arrests and adopted Commissioner's Memorandum 18-02 specifically to address that danger.

293. Notwithstanding the City's prior notice and safeguards, participating officers allegedly accepted and acted upon Chase's account of the circumstances without meaningfully resolving readily available facts bearing upon probable cause, including Plaintiff's recently granted permission to remain, the timing and number of instructions to leave, and Plaintiff's explanation.

294. Curtosi announced that he was there to take Plaintiff to jail without meaningfully investigating Plaintiff's explanation. Leonard participated in the seizure and use of force before asking what Plaintiff was being arrested for, while the supervising sergeant failed to meaningfully investigate the circumstances bearing upon probable cause.

295. The City officers thereafter acted together with Chase's constable in physically effectuating the seizure and removal sought by Chase.

296. As alleged more fully in Counts III and IX, the City's customs and deliberately indifferent failures adequately to train, supervise, discipline, and enforce its established safeguards were an affirmative link and moving force behind the officers' participation in the joint seizure.

## Constitutional Deprivation and Causation

297. Through the foregoing conduct, Chase representatives and City actors became willful participants in joint activity involving the exercise of governmental coercive authority against Plaintiff.

298. Their joint conduct deprived Plaintiff of his Fourth Amendment rights to be free from unreasonable seizure, arrest without probable cause, and excessive force.

299. Plaintiff's joint-action theory rests upon the totality of the participants' contemporaneous conduct—including Chase's allegedly materially false information, the constable's attempted pre-police seizure, his subsequent physical participation with police, and the responding

officers' actions in effectuating the seizure—rather than upon the mere fact that Chase summoned law enforcement.

300. Chase's alleged policy, custom, practice, or authorized security arrangement and the City's independently alleged municipal deficiencies each contributed to and were moving forces behind the constitutional deprivation.

301. Plaintiff seeks to hold each individual Defendant responsible only for that Defendant's own participation and each institutional Defendant responsible only upon the institutional basis for liability alleged against it.

302. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the loss of liberty, physical injuries, pain and suffering, emotional distress, humiliation, reputational harm, medical expenses, and other damages alleged throughout this Complaint.

## COUNT V

## EXCESSIVE FORCE — FOURTH AMENDMENT

## 42 U.S.C. § 1983 / MONELL

**Against Officer Leonard, Participating Officers, Supervising Sergeants, and City of Philadelphia**

303. Plaintiff incorporates by reference the preceding allegations and does not repeat the underlying factual chronology herein.

304. Officer Leonard subjected Plaintiff to three applications of a Conducted Energy Weapon ("CEW" or Taser) in drive-stun mode while Plaintiff was already surrounded and physically controlled by multiple officers. Plaintiff was unarmed, was not fleeing, had committed no violent offense, and posed no immediate threat of injury to Leonard, the other officers, or anyone else.

305. Immediately before officers physically seized him, Plaintiff had been seated in a chair, holding his wrist, and had not threatened, struck, kicked, punched, or attempted to assault any officer.

306. By the time Leonard applied the Taser, Plaintiff had been taken to the floor and his arms and legs were being physically restrained and controlled by multiple officers, including Curtosi, a supervising sergeant, and another responding officer.

307. One supervising sergeant was personally participating in that restraint and was holding Plaintiff's arm while Leonard applied the Taser to Plaintiff's back. The sergeant therefore had direct knowledge of Plaintiff's restrained condition and the degree of physical control already being exercised over him.

308. Before applying the Taser, Leonard announced, "I'm gonna drive stun him." The supervising sergeant who was physically restraining Plaintiff and holding his arm immediately repeated Leonard's statement, demonstrating that the sergeant heard and understood Leonard's announced intention to use the Taser. Leonard thereafter applied the CEW to Plaintiff's back three times in drive-stun mode.

309. Despite expressly acknowledging Leonard's announced intention and personally participating in Plaintiff's restraint, the supervising sergeant did not prevent or terminate the Taser use and continued holding Plaintiff while Leonard repeatedly applied the CEW.

310. A second supervising sergeant was positioned immediately outside the transparent, see-through doors through which the encounter was visible. To the extent that this supervisor observed or became aware of the unconstitutional force while possessing a realistic and reasonable opportunity to intervene, he likewise failed to prevent or stop it.

311. Body-worn-camera and other evidence further establishes that approximately twenty-six officers were present shortly thereafter, with more than thirty persons ultimately responding or present at the scene. Plaintiff does not allege that the number of officers, standing alone, establishes excessive force; rather, the substantial police presence further demonstrates the manpower available to control Plaintiff without repeatedly applying a pain-producing CEW.

312. Considering the minor and nonviolent offense asserted, Plaintiff's unarmed and restrained condition, absence of an immediate threat, degree of physical control already being exercised by multiple officers, and availability of numerous officers to maintain that control, Leonard's repeated drive-stun applications were objectively unreasonable under *Graham v. Connor*, 490 U.S. 386 (1989).

313. The officers and supervisors physically restraining Plaintiff while Leonard repeatedly applied the CEW, and any officers or supervisors who observed or were aware of the unconstitutional force and possessed a realistic and reasonable opportunity to prevent or stop it but failed to do so, are liable for their own participation or failure to intervene.

## Philadelphia's Express CEW Restrictions Before Plaintiff's Arrest

314. Long before April 14, 2023, Philadelphia had expressly recognized the constitutional and physical dangers associated with CEW use and had adopted detailed restrictions governing when such force could be employed.

315. Philadelphia Police Department Directive 10.3, "Use of Less Lethal Force: The Conducted Energy Weapon (CEW)," was issued October 29, 2021 and updated June 23, 2022. The June 23, 2022 version was operative before Plaintiff's April 14, 2023 arrest.

316. Directive 10.3 provided that Philadelphia officers were to use only the minimal force necessary to overcome an immediate threat or effectuate an arrest and that CEW use was authorized when a subject was "physically aggressive or assaultive" and there was an "immediate likelihood" that the subject might injure himself, an officer, or another person.

317. Directive 10.3 further provided that a CEW "shall only be discharged" against persons who were physically aggressive or assaultive and presented that immediate likelihood of injury.

318. The Directive distinguished active resistance from passive resistance and specifically prohibited use of a CEW "against a suspect exhibiting passive behavior." It further instructed that a CEW could not be used against a subject who was merely noncompliant.

319. Those restrictions directly implicated the circumstances confronting the officers here. Plaintiff alleges that he was nonviolent, unarmed, on the floor, and physically restrained by multiple officers—including a supervising sergeant holding his arm—when Leonard repeatedly applied the CEW.

PPD's Specific Restrictions on Drive-Stun Use

320. Directive 10.3 separately defined "Drive Stun" as a secondary function of the CEW and expressly stated that drive stun was "not the preferred method of application" because it ordinarily does not cause neuromuscular incapacitation but instead "causes severe pain" and increases the probability of burns to the skin.

321. The Directive instructed that drive stun should be used only in limited circumstances, including a brief application for pain compliance or distraction, to break contact when an officer is tied up with a subject, or to complete an electrical circuit where the requisite probe contact exists.

322. Directive 10.3 therefore placed Leonard and other trained CEW officers on express notice before April 14, 2023 that drive stun was a pain-producing secondary application, was not the preferred CEW method, and was restricted to limited circumstances.

323. The Directive also required an officer using a CEW to evaluate whether subsequent electrical cycles were necessary and warned that each subsequent discharge had to be independently justified and weighed against other available force options.

324. Plaintiff alleges that Leonard nevertheless subjected him to three drive-stun applications while multiple officers were already physically restraining him and while Plaintiff exhibited no physically aggressive or assaultive conduct presenting an immediate likelihood of injury.

325. The alleged force therefore implicated not merely a generalized departmental admonition against excessive force, but multiple specific restrictions Philadelphia had adopted governing

the precise weapon, method of application, level of resistance, and circumstances involved in Plaintiff's seizure.

### Directive 8.10 — Mandatory Duty to Intervene

326. Philadelphia had also adopted Directive 8.10, "Duty to Intervene to Prevent Police Misconduct, Unethical Behavior, or Mistakes — Active Bystandership for Law Enforcement (ABLE)," issued and effective June 3, 2021, nearly two years before Plaintiff's arrest.

327. Directive 8.10 expressly declared that only the force necessary to protect life or effect an arrest should be used and that "Excessive force will not be tolerated."

328. Directive 8.10 required Department employees, whenever possible, to intervene when they observed conduct suggesting another employee was about to engage in misconduct, unethical behavior, or a mistake.

329. The Directive further required employees to "actively intervene" whenever possible to stop misconduct, unethical behavior, or a mistake while such conduct was being committed by another employee.

330. Where verbal intervention was insufficient, the Directive instructed an officer, when safe and feasible, to physically intervene.

331. The circumstances alleged here presented a concrete opportunity for intervention. Leonard announced, "I'm gonna drive stun him"; multiple officers were already physically controlling Plaintiff; and the supervising sergeant holding Plaintiff's arm heard and repeated Leonard's announced intention before the CEW was applied.

332. That sergeant was not merely a supervisor elsewhere at the scene. He was physically participating in Plaintiff's restraint, knew firsthand the degree to which Plaintiff was already controlled, expressly acknowledged Leonard's announced intention to use the Taser, and remained positioned to intervene as the force was applied.

333. Nevertheless, neither that supervising sergeant nor any other participating officer with a realistic and reasonable opportunity to intervene prevented the announced drive-stun use or stopped the repeated applications.

### Pattern, Municipal Notice, and Deliberate Indifference

334. Notwithstanding these detailed written safeguards, Philadelphia policymakers had substantial notice before April 14, 2023 that allegations of excessive force, repeated officer misconduct, and deficiencies in accountability persisted within the Police Department.

335. The 2021 Collaborative Review of the Philadelphia Police Department's disciplinary system examined approximately 9,000 allegations arising from more than 3,500 civilian

complaints between 2015 and 2020 and identified substantial deficiencies in investigation, discipline, and accountability.

336. Those findings included that approximately 86% of allegations did not advance beyond the initial investigative stage; that when Internal Affairs found evidence supporting misconduct, a substantial proportion resulted in training or counseling rather than discipline; and that only a very small proportion of civilian allegations resulted in a recorded disciplinary consequence beyond reprimand.

337. Those findings provided policymakers notice that written force and intervention directives, without adequate supervision, enforcement, investigation, and discipline, were insufficient to ensure compliance.

338. That notice was reinforced by a March 9, 2022 *Washington Post* investigation of police-misconduct payments. The *Post's* public-records analysis reported that Philadelphia paid approximately $136 million between 2010 and 2020 to resolve police-misconduct claims and that approximately 59% of Philadelphia's payments involved officers associated with multiple paid claims.

339. The misconduct claims examined by the *Washington Post* included allegations ranging from illegal searches and seizures to excessive force. The investigation further reported that six Philadelphia narcotics officers generated approximately 173 lawsuits that cost approximately $6.5 million to resolve.

340. Plaintiff does not allege that the settlements or payments themselves establish that constitutional violations occurred. They are alleged as part of the information available before Plaintiff's arrest bearing upon municipal notice of recurring allegations of force and repeated misconduct involving Philadelphia officers.

341. Less than one month before Plaintiff's arrest, Philadelphia also agreed to pay approximately $9.25 million to resolve claims arising from the Police Department's response to the 2020 demonstrations, including allegations that officers had used excessive force against protesters and residents.

342. No single complaint, lawsuit, settlement, report, or prior incident independently establishes municipal liability. Collectively, however, the City's own detailed force and intervention directives, repeated misconduct claims, disciplinary-system findings, and substantial settlements support the reasonable inference that policymakers had continuing notice that promulgating written restrictions alone was insufficient without meaningful training, supervision, intervention, monitoring, investigation, and discipline.

Failure to Train, Supervise, Intervene, and Enforce Existing Safeguards

343. Despite that notice, Philadelphia failed adequately to ensure that officers and supervisors complied with Directive 10.3's restrictions on CEW and drive-stun use and Directive 8.10's affirmative intervention requirements.

344. Plaintiff alleges that the municipal deficiency was not simply the absence of a written force policy. Philadelphia had detailed written safeguards. The deficiency was the City's failure adequately to train, supervise, monitor, investigate, discipline, and otherwise enforce those safeguards in practice despite notice of recurring force and accountability problems.

345. Plaintiff's arrest illustrates the foreseeable consequence of those deficiencies: Leonard announced that he intended to drive stun a nonviolent person already restrained by multiple officers; the supervising sergeant physically holding Plaintiff's arm heard and repeated Leonard's announcement; Leonard then repeatedly applied the CEW; and neither the participating supervisor nor other officers prevented or terminated the force.

346. The simultaneous participation or nonintervention of multiple officers, including a supervisor directly involved in Plaintiff's restraint and aware of Leonard's announced intention, together with Leonard's alleged use of drive stun under circumstances facially inconsistent with Directive 10.3's threshold requirements, supports an inference that the incident was not merely an isolated misunderstanding by Leonard concerning CEW operation.

347. The City's inadequate enforcement and accountability practices permitted officers reasonably to believe that violations of force and intervention requirements would not consistently produce meaningful corrective or disciplinary consequences, thereby diminishing the deterrent effect of the written policies.

348. Philadelphia's continued failure adequately to correct those deficiencies despite preexisting notice constituted deliberate indifference to the foreseeable risk that persons who were passive, nonviolent, restrained, or otherwise physically controlled would be subjected to unnecessary force and that officers and supervisors present would fail to intervene.

## Affirmative Link and Causation

349. There is a direct causal and affirmative link between the municipal deficiencies alleged above and the constitutional injury suffered by Plaintiff.

350. Had Philadelphia adequately trained, supervised, monitored, and disciplined its officers concerning Directive 10.3, Leonard would have been required to assess whether Plaintiff was physically aggressive or assaultive and presented an immediate likelihood of injury before deploying the CEW, and to independently justify each additional application.

351. Had Philadelphia adequately enforced Directive 8.10, the supervising sergeant holding Plaintiff's arm—who heard and repeated Leonard's announced intention to drive stun

Plaintiff—and other officers participating in Plaintiff's restraint would have been required, when realistically able and safe to do so, to intervene before or during prohibited force.

352. The precise risks addressed by those directives materialized: Leonard allegedly applied a pain-producing drive stun three times to an unarmed, nonviolent Plaintiff while multiple officers physically restrained him, including a supervising sergeant holding his arm who had actual contemporaneous notice of Leonard's intended Taser use, and no officer or supervisor with a realistic and reasonable opportunity to intervene prevented or stopped the force.

353. Philadelphia's deliberately indifferent failures to train, supervise, monitor, discipline, and meaningfully enforce its CEW and intervention requirements were therefore an affirmative link and moving force behind the constitutional deprivation alleged.

354. The individual Defendants are liable only for their own use of force, assistance in the use of force, direction of force, or failure to intervene where they possessed a realistic and reasonable opportunity to do so. The City is liable only upon the municipal bases alleged herein and not under respondeat superior.

355. As a direct and proximate result of Defendants' conduct, Plaintiff suffered physical injuries, pain, emotional distress, humiliation, medical expenses, loss of liberty, and other compensable damages.

## COUNT VI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Against JPMorgan Chase Bank, N.A.

356. Plaintiff incorporates by reference the preceding allegations and does not repeat the underlying factual chronology herein.

357. Under Pennsylvania law, intentional infliction of emotional distress arises where a defendant intentionally or recklessly engages in extreme and outrageous conduct that causes severe emotional distress.

358. Plaintiff does not base this claim merely upon Chase's temporary restriction of his accounts or upon the isolated fact that police ultimately were summoned. Rather, the claim arises from Chase's cumulative course of conduct toward a recently bereaved customer whose particular emotional vulnerability and urgent family circumstances were repeatedly made known to Chase.

359. From the opening of the joint account, Chase knew that Plaintiff's mother had recently died, that Plaintiff was actively grieving her death, and that the deposited funds were being assembled and used in connection with her burial, estate, and related family obligations.

360. Plaintiff repeatedly explained to Chase personnel that access to the funds was urgent because he was responsible for addressing his deceased mother's estate and outstanding burial-related obligations.

361. Chase therefore had actual knowledge that restricting and withholding Plaintiff's funds was not merely inconveniencing an ordinary banking customer, but was interfering with his ability to attend to time-sensitive obligations arising directly from his mother's death while he was grieving.

362. Notwithstanding that knowledge, Chase continued the course of conduct alleged above after Plaintiff repeatedly attempted to satisfy its verification demands, traveled to multiple branches, provided requested information, and sought alternative means to resolve Chase's stated concern.

363. Chase persisted even after Plaintiff offered to remove or void the approximately $200 check that Chase identified as problematic so that the remaining funds could be made available for his mother's estate obligations.

364. Chase likewise rejected Plaintiff's proposed telephone verification with the check issuer, insisted upon an in-person appearance despite being advised of the issuer's limited mobility, and continued withholding Plaintiff's access to funds notwithstanding the alternatives Plaintiff proposed.

365. Chase personnel were therefore not merely aware of Plaintiff's bereavement in the abstract. They were repeatedly informed that their actions were delaying Plaintiff's ability to pay burial-related expenses and to discharge responsibilities associated with his mother's estate.

366. Plaintiff alleges that Chase consciously disregarded those circumstances and continued escalating the dispute despite knowing the particular emotional significance and foreseeable consequences of doing so to a recently bereaved customer.

367. That escalation culminated in Chase representatives employing bank security and governmental authority against Plaintiff while the underlying dispute remained a banking dispute concerning access to funds Plaintiff had repeatedly explained were needed for his deceased mother's affairs.

368. As alleged above, that escalation was accompanied by materially inaccurate representations concerning Plaintiff's conduct and the circumstances preceding police involvement, thereby increasing the foreseeable risk that Plaintiff would be subjected to arrest, humiliation, and physical confrontation.

369. Following the arrest, Chase continued conduct directed toward Plaintiff notwithstanding its knowledge of what had occurred, including direct communications after Plaintiff instructed Chase to communicate through retained counsel and continuing account-related communications after the banking relationship was being terminated.

370. The outrageousness alleged therefore rests upon the **combined and continuing conduct,** viewed in light of Chase's actual knowledge that Plaintiff was grieving, that the funds were connected to his mother's death and estate, that Plaintiff faced urgent burial and estate obligations, and that Chase's conduct was preventing or delaying him from fulfilling those obligations.

371. Chase's knowledge of Plaintiff's bereavement and particular vulnerability is material to whether conduct that might otherwise constitute an ordinary commercial dispute became extreme and outrageous when Chase knowingly persisted in conduct calculated or substantially certain to intensify that distress.

372. Through its employees and representatives acting within the course and scope of their Chase responsibilities, Chase acted intentionally or, at minimum, recklessly in deliberate disregard of the substantial probability that its conduct would cause Plaintiff severe emotional distress.

373. Chase's conduct did in fact substantially delay Plaintiff's ability to pay burial-related costs and attend to his mother's estate, thereby compounding the grief and emotional burden he was already experiencing following his mother's death.

374. The emotional injury was not momentary embarrassment or ordinary frustration arising from a banking dispute. Plaintiff experienced severe and continuing emotional distress resulting from the combination of the interference with his mother's burial and estate responsibilities, the escalation at the branch, his arrest and associated humiliation, and Chase's subsequent conduct.

375. Plaintiff subsequently required and received continuing therapeutic treatment for approximately two years for the emotional and psychological consequences associated with the events alleged herein.

376. Plaintiff therefore alleges severe emotional distress substantially greater than the transient anxiety, embarrassment, anger, or inconvenience ordinarily associated with a commercial disagreement.

377. Taken cumulatively, and particularly in light of Chase's actual and repeated knowledge of Plaintiff's bereavement and the urgent purpose for which the funds were needed, the conduct alleged was extreme and outrageous, intentional or reckless, and sufficiently beyond the bounds of ordinary commercial conduct to support liability for intentional infliction of emotional distress.

378. Chase's conduct was a direct and substantial cause of Plaintiff's severe emotional distress and resulting damages.

COUNT VII

DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS / DENIAL OF MEDICAL CARE

FOURTEENTH AMENDMENT — 42 U.S.C. § 1983

Against the Individual City Defendants and the City of Philadelphia

379. Plaintiff incorporates by reference the preceding allegations and does not repeat the underlying chronology herein.

380. As a pretrial detainee, Plaintiff had a constitutional right under the Fourteenth Amendment to necessary medical care and to be free from deliberate indifference to a serious medical need.

381. Plaintiff's medical need was objectively serious. He had been subjected to three direct-contact Taser applications to his back, had been forcibly restrained and taken to the floor, and thereafter experienced physical pain, visible injuries, back symptoms, and respiratory difficulty.

382. The officers who participated in and observed the Taser applications necessarily knew that Plaintiff had been subjected to repeated electrical force and therefore knew facts requiring assessment and medical attention.

383. Philadelphia's own then-existing Directive 10.3 made that need unmistakable. The June 23, 2022 version in effect before Plaintiff's arrest required officers, once a suspect was secured, to "immediately address any injuries" sustained and required that **all persons exposed to a CEW activation be transported to a medical facility for treatment.** It further required notification and monitoring of an arrested person following medical treatment.

384. The denial alleged here therefore was not merely a difference of opinion about treatment. Plaintiff alleges that no required post-CEW medical evaluation or transport was provided at the scene despite three activations and despite a written City directive expressly requiring medical treatment following CEW exposure.

On-Scene Knowledge and Deliberate Disregard

385. The body-worn-camera and police-radio evidence is particularly probative of the responding officers' contemporaneous awareness of potential injury following the use of force.

386. Immediately following the Taser applications, radio communications repeatedly sought information regarding whether responding police personnel had been injured, including the inquiry, "Any injuries to police?"

387. The supervising sergeant separately confirmed the condition of responding officers, including Curtosi and another officer, to determine whether they had been injured.

388. Seconds later, another officer's body-worn camera captured Officer Leonard asking over the radio whether the officer had been able to "resume the assist," to which the officer responded, "I've resumed like three times."

389. A separate body-worn-camera recording reflects the supervising sergeant again resuming or confirming the assist and again determining that no officer had been harmed, and Leonard thereafter can be seen resuming the assist as Plaintiff was escorted from the bank.

390. Taken together, the recordings reflect at least six inquiries, confirmations, or status communications concerning whether officers were injured, safe, or able to resume the assist following the physical encounter.

391. During those repeated communications concerning the welfare and operational status of the officers, no comparable inquiry, assessment, or request for medical assistance was made for Plaintiff, although he was the person who had just been subjected to three Taser applications.

392. This contrast is material to deliberate indifference. The officers and their supervisor were actively evaluating the possibility of injury resulting from the encounter yet failed to evaluate the person upon whom the electrical weapon had actually been deployed.

393. The failure continued notwithstanding Directive 10.3's requirement that a person exposed to a CEW be transported for medical treatment.

### Continuing Denial While in Custody

394. The deprivation did not end at the bank. During Plaintiff's approximately fourteen hours in City custody, he repeatedly sought medical assistance for injuries and symptoms resulting from the force used against him.

395. Plaintiff requested medical care approximately eight times from the guard patrolling his detention area between approximately 7:00 p.m. and 10:00 p.m., made an additional request to a processing officer, and later made another request to medical personnel or a nurse after approximately 3:00 a.m.

396. Despite those repeated requests, no one meaningfully examined Plaintiff's Taser injuries, treated his complaints, or arranged appropriate medical care before his release.

397. The repeated nature of those requests permitted the responsible personnel to know that Plaintiff was not merely complaining of a momentary discomfort but was persistently requesting treatment for injuries sustained immediately before entering City custody.

398. Plaintiff later required outside medical evaluation and treatment and continued experiencing physical symptoms after his release.

**Prior Municipal Notice**

399. Long before April 14, 2023, Philadelphia had notice that failures to recognize, communicate, and respond to detainees' medical needs could produce serious constitutional injury.

400. In *Wichterman v. City of Philadelphia*, arising from the 2015 death of a detainee in PPD custody, the district court denied Philadelphia's motion to dismiss a Monell claim alleging failures in policies, practices, supervision, and training concerning detainee medical needs. The allegations included officers failing to obtain medical assistance despite observing circumstances requiring attention.

401. The subsequent *Wichterman* record included evidence criticizing PPD training and practices concerning medical monitoring, reporting changes in detainee condition, and failures adequately to investigate in-custody medical deaths.

402. In *Davis v. City of Philadelphia*, 284 F. Supp. 3d 744 (E.D. Pa. 2018), another Philadelphia detainee alleged that serious medical needs were not properly identified and communicated after intake, resulting in a prolonged delay in necessary treatment. The court held that the allegations supported a plausible inference that the City's inadequate medical-care practices could support Monell liability.

403. These matters placed Philadelphia on notice before Plaintiff's 2023 arrest that inadequate medical screening, communication, monitoring, and response to persons in police custody could result in constitutional violations.

404. Philadelphia nevertheless failed adequately to ensure that officers and custodial personnel consistently recognized serious medical needs, communicated those needs through the chain of custody, followed mandatory post-force medical procedures, and responded when detainees repeatedly requested treatment.

**Municipal Custom, Failure to Train, and Causation**

405. Plaintiff alleges that the City maintained, tolerated, or failed adequately to correct customs and practices under which officers and custodial personnel did not consistently comply with

required medical-assessment, referral, monitoring, and escalation procedures following force or repeated detainee complaints.

406. Plaintiff further alleges deliberate indifference in the City's failure adequately to train, supervise, monitor, and discipline personnel concerning recognition of serious medical needs, mandatory post-CEW treatment, communication of medical information during transfer and processing, and prompt response to repeated requests for treatment.

407. The events involving Plaintiff reflect precisely the risk of which Philadelphia had prior notice: potentially serious medical information was known at one stage of custody but was either disregarded or not acted upon as the detainee moved through police processing.

408. At the scene, the responding officers knew Plaintiff had sustained three Taser applications but did not obtain the medical treatment required by Directive 10.3.

409. During detention, Plaintiff then personally and repeatedly supplied additional notice of his medical need, yet multiple City personnel again failed to provide care.

410. The recurrence of the failure across different personnel and stages of custody—arresting officers, supervising personnel, processing personnel, detention staff, and medical personnel—supports the inference that the deprivation was not attributable solely to an isolated error by a single employee.

411. The City's failure adequately to enforce its existing medical-care requirements, train personnel to communicate and respond to medical needs, and correct previously identified deficiencies despite prior notice constituted deliberate indifference to the constitutional rights of persons in City custody.

412. Had the City adequately enforced its post-CEW medical requirements and trained and supervised its personnel to recognize, communicate, and respond to detainee medical needs, Plaintiff would have been medically assessed and treated promptly following the Taser applications rather than remaining untreated throughout his detention.

413. Those municipal deficiencies were therefore an affirmative link and moving force behind the denial of medical care and resulting injuries alleged herein.

**Individual Liability**

414. The individual Defendants are liable only for their own acts or omissions. Liability is asserted against those officers, supervisors, guards, processing personnel, or other City actors who knew of Plaintiff's serious medical need and consciously disregarded it by failing to obtain, provide, or facilitate appropriate medical attention.

415. The supervising sergeant's knowledge that Plaintiff had just been subjected to force, combined with the repeated radio inquiries concerning injuries to officers and the absence of

any corresponding assessment of Plaintiff, supports an inference of conscious disregard rather than mere inadvertence.

416. Likewise, the custodial personnel to whom Plaintiff repeatedly requested medical assistance had direct notice of his continuing need and allegedly failed to secure meaningful evaluation or treatment.

417. The City is liable not under respondeat superior, but because the deliberately indifferent failures in policy implementation, training, supervision, monitoring, and discipline alleged above caused the constitutional deprivation.

418. As a direct and proximate result of Defendants' conduct, Plaintiff suffered prolonged untreated pain, physical injury, respiratory symptoms, aggravation of his injuries, emotional distress, medical expenses, and other damages.

COUNT VIII

MALICIOUS PROSECUTION — FOURTH AMENDMENT

42 U.S.C. § 1983 / MONELL

Against Officer Curtosi, Participating Officers, and City of Philadelphia

419. Plaintiff incorporates by reference the preceding allegations and does not repeat the underlying factual chronology herein.

420. This Count asserts malicious prosecution solely under 42 U.S.C. § 1983 and the Fourth Amendment. Plaintiff does not reassert against the City the Pennsylvania-law claims for malicious prosecution or abuse of process that the Court dismissed with prejudice.

**Initiation of Criminal Proceedings**

421. Officer Curtosi caused and participated in the initiation of criminal proceedings against Plaintiff for Defiant Trespass under 18 Pa. C.S. § 3503.

422. After Plaintiff had been physically seized, subjected to force, and handcuffed, Officer Leonard asked, "What's he getting locked up for?" Curtosi responded, "Trespass. Defiant trespass."

423. Leonard's question demonstrates that, although he had already participated in Plaintiff's seizure and use of force, he had not yet been informed of the offense for which Plaintiff was being arrested.

424. Plaintiff was thereafter processed and criminally prosecuted for Defiant Trespass based upon the officers' account of the events at the Chase branch.

Absence of Probable Cause

425. Probable cause for Defiant Trespass required facts sufficient to establish that Plaintiff knowingly remained in a place where he was not licensed or privileged to remain after legally sufficient notice against trespass.

426. The readily available circumstances known or ascertainable by the responding officers did not establish that element without further inquiry.

427. Plaintiff had been lawfully conducting banking business inside Chase for approximately two hours and had been seated in Chase banker Jeison Brito's office with Brito's permission while Brito communicated with Chase corporate concerning Plaintiff's restricted funds.

428. Less than ten minutes before Mecca Abdullah directed Plaintiff to leave, Plaintiff specifically expressed concern to Brito that it was getting late, and Brito affirmatively reassured Plaintiff that he was permitted to remain while the banking matter was being resolved.

429. Brito never withdrew that permission and never personally instructed Plaintiff to leave.

430. When Abdullah subsequently instructed Plaintiff to leave, she did not identify herself to Plaintiff as the branch manager, Brito's supervisor, or a person possessing authority superior to Brito, whose express permission for Plaintiff to remain had not been withdrawn.

431. When the constable approached Plaintiff immediately thereafter and stated, "Why are you staying? You're going to get arrested," Plaintiff responded, "I don't wanna be here. I will leave as soon as I get my money."

432. Those circumstances presented an obvious question concerning Plaintiff's knowledge that his previously granted license or privilege to remain had been unequivocally revoked—an element directly material to the Defiant Trespass charge.

433. Nevertheless, upon Officer Curtosi's arrival, Plaintiff attempted to engage him regarding the situation. Curtosi did not meaningfully engage Plaintiff or inquire into his explanation and instead stated that he was there to take Plaintiff to jail.

434. Neither Curtosi nor the supervising officers meaningfully investigated the conflicting circumstances surrounding Plaintiff's authorization to remain before deciding to arrest and charge him.

435. The supervising sergeant did not independently ascertain from Brito whether Brito had authorized Plaintiff to remain, whether that permission had been withdrawn, or the circumstances under which Abdullah subsequently directed Plaintiff to leave.

436. Brito remained present and did not tell the responding officers that he had withdrawn his permission for Plaintiff to remain.

437. The officers therefore proceeded with the Defiant Trespass charge without meaningfully investigating readily available facts bearing directly upon whether Plaintiff knowingly remained without license or privilege.

**Philadelphia Had Specifically Recognized the Risk of Improper Retailer-Driven Defiant-Trespass Arrests**

438. The failure to investigate was particularly significant because, years before Plaintiff's arrest, Philadelphia had expressly recognized the danger that police authority could be misused when private businesses sought Defiant Trespass arrests against customers or other persons lawfully present in businesses open to the public.

439. Following the April 2018 arrests of two Black customers at a Philadelphia Starbucks, the Philadelphia Police Department issued **Commissioner's Memorandum 18-02 on June 8, 2018**, specifically governing Defiant Trespass enforcement at private businesses open to the public.

440. Commissioner's Memorandum 18-02 expressly recognized that Defiant Trespass arrests at such businesses are complaint-driven by business owners or authorized persons and established safeguards "**to avoid misuse of police authority by business owners and the appearance of any impropriety by the officers.**"

441. Before making a misdemeanor Defiant Trespass arrest at a business open to the public, the Memorandum directed officers to attempt to de-escalate and mediate the disturbance between the business and the alleged offender, request a Crisis Intervention Team-trained officer where appropriate, and request a supervisor.

442. Thus, by 2018 Philadelphia itself had identified the precise recurring risk implicated here: a private business invoking police authority against a customer, followed by officers making a Defiant Trespass arrest without sufficiently separating the business's demand for removal from the officers' independent constitutional obligation to determine whether probable cause existed.

443. Plaintiff does not allege that violation of Commissioner's Memorandum 18-02, standing alone, establishes a Fourth Amendment violation. The Memorandum is relevant because it demonstrates that Philadelphia had actual institutional notice, years before Plaintiff's arrest, of the risk of improper retailer-driven Defiant Trespass arrests and had determined that mediation and supervisory safeguards were necessary.

### Failure of the Safeguards in Plaintiff's Arrest and Prosecution

444. The circumstances alleged here presented the precise situation contemplated by Commissioner's Memorandum 18-02: a customer inside a business open to the public, a dispute between the customer and the business, a business representative seeking his removal, and police asked to exercise arrest authority for Defiant Trespass.

445. Although a supervisor responded, the presence of supervisory personnel did not result in meaningful investigation of whether the statutory elements of Defiant Trespass were actually satisfied.

446. The officers did not meaningfully reconcile Brito's immediately preceding permission for Plaintiff to remain with Abdullah's later instruction, determine whether Plaintiff knew that Brito's authorization had been revoked, or investigate Plaintiff's explanation before initiating the criminal charge.

447. Curtosi instead announced that Plaintiff was going to jail before meaningfully investigating Plaintiff's account, and the seizure and use of force proceeded before Leonard had even been informed of the offense for which Plaintiff was being arrested.

448. The presence of numerous officers and a supervising sergeant therefore did not produce the independent investigation, mediation, or supervisory safeguard Philadelphia itself had determined was necessary to reduce misuse of police authority in retailer-driven Defiant Trespass encounters.

### Criminal Proceedings and Favorable Termination

449. Plaintiff was formally charged with Defiant Trespass and subjected to criminal proceedings as a consequence of the officers' initiation and continuation of that charge.

450. Plaintiff requested discovery in the criminal proceeding, including evidence concerning the basis for his arrest and prosecution.

451. The prosecution subsequently sought dismissal, and the criminal proceeding ultimately terminated on September 11, 2023 without a conviction or finding of guilt against Plaintiff.

452. The September 11, 2023 termination was favorable to Plaintiff because the prosecution ended without a conviction.

### Malice or Purpose Other Than Bringing Plaintiff to Justice

453. The absence of probable cause, together with the circumstances surrounding the initiation of the charge, supports a reasonable inference that the prosecution was initiated maliciously or for a purpose other than bringing Plaintiff to justice.

454. That inference is supported by Curtosi's declaration that Plaintiff was going to jail before meaningfully investigating Plaintiff's explanation; the officers' failure to investigate readily available information bearing directly upon the Defiant Trespass elements; Leonard's participation in Plaintiff's seizure and force before being informed what offense supposedly justified the arrest; and the subsequent initiation of the Defiant Trespass charge.

455. Plaintiff does not rely solely upon the ultimate dismissal of the criminal charge to establish malice. Rather, malice is inferred from the alleged absence of probable cause and the circumstances under which the decision to arrest and prosecute was made.

**Fourth Amendment Deprivation of Liberty**

456. As a consequence of the criminal proceeding initiated against him, Plaintiff suffered a deprivation of liberty consistent with a Fourth Amendment seizure, including his arrest, approximately fourteen hours of detention, criminal processing, and the continuing burdens associated with defending against the criminal charge until its termination.

457. Those deprivations resulted directly from the Defiant Trespass proceeding initiated against Plaintiff.

**Municipal Notice, Custom, and Deliberate Indifference**

458. Plaintiff does not seek to hold Philadelphia liable merely because Curtosi or other City employees allegedly violated his constitutional rights.

459. Rather, Philadelphia had specifically identified, through Commissioner's Memorandum 18-02, the danger that business owners could misuse police enforcement authority in Defiant Trespass encounters and that officers could create an appearance of impropriety by acting at the behest of retailers without adequate mediation and supervisory safeguards.

460. The Memorandum demonstrates that the danger was not hypothetical or unforeseeable to municipal policymakers. Philadelphia had already experienced a highly publicized retailer-driven Defiant Trespass arrest and responded by adopting specialized safeguards directed at that precise category of police encounter.

461. Philadelphia also had broader pre-April-2023 notice of recurring allegations involving false arrest, malicious prosecution, unlawful searches, and other police misconduct through civil litigation, settlements, civilian complaints, and reviews of its disciplinary system.

462. Publicly reported City data showed hundreds of police-misconduct claims during the years preceding Plaintiff's arrest, with false arrest and malicious prosecution among the recurring categories of claims asserted against Philadelphia police.

463. The 2021 collaborative review of Philadelphia's police disciplinary process examined approximately 9,000 allegations arising from more than 3,500 civilian complaints between 2015 and 2020 and identified substantial deficiencies in investigation, accountability, and discipline.

464. Those findings included that approximately 86% of allegations did not advance beyond the initial investigation; that when Internal Affairs found evidence of misconduct, a substantial proportion resulted in training or counseling rather than formal discipline; and that only a very small percentage of civilian allegations produced a recorded consequence beyond reprimand.

465. Those preexisting circumstances supplied Philadelphia policymakers with notice that merely promulgating written constitutional safeguards was insufficient if those safeguards were not adequately trained, supervised, monitored, enforced, and reinforced through meaningful accountability.

466. Plaintiff does not allege that any individual lawsuit, complaint, settlement, report, or disciplinary statistic independently proves a municipal custom of malicious prosecution. Collectively, they are alleged as notice bearing upon Philadelphia's knowledge of recurring arrest, prosecution, investigation, supervision, and accountability deficiencies.

**Failure to Train, Supervise, and Enforce Defiant-Trespass Safeguards**

467. Despite having expressly recognized the risk of misuse of police authority in retailer-driven Defiant Trespass cases, Philadelphia failed adequately to train, supervise, monitor, and discipline officers concerning the meaningful implementation of the safeguards embodied in Commissioner's Memorandum 18-02.

468. The municipal deficiency was therefore not simply the absence of a written policy. Philadelphia had adopted a policy addressing the precise risk. The alleged deficiency was its failure adequately to ensure that officers and supervisors actually implemented those safeguards before exercising arrest and prosecution authority.

469. Plaintiff's encounter illustrates the foreseeable consequence of that deficiency: officers responded to a private business dispute, failed meaningfully to investigate conflicting information concerning Plaintiff's permission to remain, failed to mediate the dispute in any meaningful manner, and proceeded with arrest and prosecution notwithstanding readily available information bearing directly upon probable cause.

470. The participation of line officers and supervisory personnel without meaningful implementation of the City's specialized safeguards supports an inference that the failure was not merely an isolated omission by a single officer.

471. Philadelphia's failure adequately to train, supervise, monitor, discipline, and enforce those safeguards despite its prior recognition of the specific risk constituted deliberate indifference to the foreseeable consequence that persons would be arrested and prosecuted for Defiant Trespass without constitutionally sufficient probable cause.

**Affirmative Link and Moving Force**

472. There is a direct causal and affirmative link between the municipal deficiencies alleged above and Plaintiff's prosecution.

473. Had Philadelphia adequately implemented and enforced the safeguards it adopted after recognizing the danger of retailer-driven Defiant Trespass arrests, the responding officers and supervisor would have meaningfully investigated the readily available circumstances concerning Plaintiff's license or privilege to remain before initiating criminal proceedings.

474. Such an inquiry would have disclosed that Brito had expressly authorized Plaintiff to remain only minutes earlier, that Brito never withdrew that permission, that Abdullah had not identified herself to Plaintiff as possessing authority superior to Brito, and that Plaintiff was attempting to resolve an ongoing banking dispute rather than secretly or surreptitiously occupying the premises.

475. Instead, the officers proceeded with arrest and prosecution without meaningfully resolving those circumstances, thereby allowing the very risk Philadelphia had identified in Commissioner's Memorandum 18-02—the use of police arrest authority at the behest of a private retailer without adequate safeguards—to materialize.

476. Philadelphia's deliberately indifferent failure adequately to train, supervise, monitor, discipline, and enforce its Defiant Trespass safeguards was therefore an affirmative link and moving force behind the initiation and continuation of the criminal proceeding against Plaintiff.

477. The individual Defendants are liable only for their own participation in initiating or continuing the criminal proceeding without probable cause and with malice or a purpose other than bringing Plaintiff to justice. The City is liable solely upon the municipal bases alleged herein and not under respondeat superior.

478. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, detention, the burden and expense of defending against a criminal charge, emotional distress, reputational harm, and other compensable injuries until the proceeding terminated in his favor.

COUNT IX

## MUNICIPAL LIABILITY — 42 U.S.C. § 1983 / MONELL

### Against the City of Philadelphia

479. Plaintiff incorporates by reference the preceding allegations, including Counts III, V, VII, and VIII, and does not repeat the underlying factual chronology herein.

480. Plaintiff does not seek to impose liability upon the City merely because Philadelphia police officers or other municipal employees allegedly violated his constitutional rights. The City is liable only for constitutional injuries caused by its own policies, customs, deliberately indifferent failures to train, supervise, monitor, discipline, or enforce existing safeguards.

### Specific Municipal Deficiencies

481. Before April 14, 2023, Philadelphia had adopted written policies addressing the very constitutional risks implicated in Plaintiff's encounter, including Commissioner's Memorandum 18-02 governing Defiant Trespass arrests at businesses open to the public, Directive 10.3 governing Conducted Energy Weapon use and post-CEW medical care, and Directive 8.10 requiring officers affirmatively to intervene to prevent or stop police misconduct.

482. Plaintiff therefore does not allege merely that Philadelphia lacked written policies. The municipal deficiencies alleged were the City's longstanding and deliberately indifferent failures adequately to train, supervise, monitor, investigate, discipline, and enforce compliance with those safeguards in practice.

483. Those deficiencies concerned four related areas:

(a) failure to ensure meaningful investigation, mediation, and supervisory review before retailer-driven Defiant Trespass arrests and prosecutions;

(b) failure to enforce restrictions governing CEW and drive-stun use against passive, nonviolent, restrained, or controlled persons;

(c) failure to ensure officers intervene when another officer is about to use or is using unconstitutional force; and

(d) failure to enforce mandatory medical evaluation, treatment, referral, and monitoring following CEW exposure and repeated detainee requests for medical care.

### Preexisting Notice

484. Philadelphia policymakers had notice before Plaintiff's arrest that constitutional violations and accountability failures were recurring concerns within the Police Department.

485. Commissioner's Memorandum 18-02 itself demonstrates specific municipal notice of the danger that private businesses could misuse police authority to obtain Defiant Trespass arrests and expressly adopted mediation and supervisory safeguards to prevent that risk.

486. Philadelphia likewise had detailed preexisting CEW restrictions under Directive 10.3 and intervention requirements under Directive 8.10, demonstrating municipal recognition that unnecessary CEW use, repeated applications, failures to intervene, and post-force medical neglect created substantial risks of constitutional injury.

487. The 2021 collaborative review of Philadelphia's police disciplinary system examined approximately 9,000 allegations arising from more than 3,500 civilian complaints between 2015 and 2020 and identified substantial deficiencies in investigation, accountability, and discipline.

488. Among the review's findings were that approximately 86% of allegations did not advance beyond initial investigation; that supported misconduct frequently resulted in training or counseling rather than meaningful discipline; and that only a very small proportion of civilian allegations resulted in disciplinary consequences beyond reprimand.

489. Publicly reported municipal data and litigation preceding Plaintiff's arrest likewise reflected recurring allegations of excessive force, false arrest, unlawful searches, malicious prosecution, and related police misconduct.

490. A 2022 *Washington Post* investigation reported that Philadelphia paid approximately $136 million between 2010 and 2020 to resolve police-misconduct claims and that approximately 59% of the payments involved officers associated with multiple paid claims.

491. The same investigation reported that six Philadelphia narcotics officers alone were associated with approximately 173 lawsuits costing roughly $6.5 million to resolve.

492. Less than one month before Plaintiff's arrest, Philadelphia agreed to a substantial settlement arising from allegations of excessive force during the 2020 demonstrations.

493. Pre-April-2023 litigation including *Davis v. City of Philadelphia* and *Wichterman v. City of Philadelphia* further placed the City on notice of allegations concerning failures to identify, communicate, monitor, and respond appropriately to detainees' serious medical needs.

494. Plaintiff does not allege that any single complaint, settlement, lawsuit, report, or disciplinary statistic independently establishes municipal liability. Collectively, however, these circumstances plausibly demonstrate that policymakers were aware of recurring constitutional risks and accountability deficiencies but failed adequately to correct them.

**Deliberate Indifference**

495. Despite this notice, Philadelphia continued to rely substantially upon written policies without ensuring their meaningful implementation through adequate training, supervision, monitoring, investigation, discipline, and enforcement.

496. The persistence of recurring misconduct allegations, weak disciplinary outcomes, and failures to implement safeguards addressing known risks permitted unconstitutional practices to continue and diminished the deterrent effect of Philadelphia's written directives.

497. Philadelphia's continued failure to correct these known deficiencies constituted deliberate indifference to the highly predictable consequence that persons would be arrested without adequate probable-cause investigation, subjected to unnecessary force, denied intervention by surrounding officers, denied required post-force medical attention, and prosecuted without constitutionally sufficient grounds.

**Plaintiff's Encounter Demonstrates the Municipal Failures**

498. The constitutional injuries alleged in this action were manifestations of those identified municipal deficiencies rather than unrelated omissions.

499. Regarding false arrest and malicious prosecution, officers responded to a business dispute covered by the City's Defiant Trespass safeguards but failed meaningfully to investigate Plaintiff's recently granted permission to remain, mediate the conflicting circumstances, or independently determine whether the statutory elements of Defiant Trespass were satisfied.

500. Regarding excessive force, Leonard announced his intention to drive stun Plaintiff and thereafter applied the CEW three times while Plaintiff was allegedly nonviolent and already surrounded and physically controlled, notwithstanding Directive 10.3's restrictions.

501. Multiple officers and a supervising sergeant were present, yet no officer with a realistic and reasonable opportunity prevented or stopped the alleged unconstitutional force despite Directive 8.10's affirmative intervention requirements.

502. Regarding medical care, Plaintiff received three CEW applications, yet officers repeatedly communicated concerning whether responding officers had been injured or could "resume the assist" without providing Plaintiff a comparable medical assessment or the mandatory post-CEW medical treatment required by Directive 10.3.

503. The denial continued during Plaintiff's approximately fourteen hours in custody despite repeated requests for medical assistance to custodial, processing, and medical personnel.

504. The involvement of multiple officers, supervisory personnel, and custodial personnel across separate stages of Plaintiff's detention supports the inference that the alleged failures were not attributable solely to one isolated employee or momentary mistake.

Direct Causal Link and Moving Force

505. There is a direct causal link between the municipal deficiencies identified above and the constitutional injuries alleged in Counts III, V, VII, and VIII.

506. Had Philadelphia adequately trained, supervised, monitored, disciplined, and enforced Commissioner's Memorandum 18-02, the officers would have meaningfully investigated and mediated the retailer-driven Defiant Trespass dispute before arresting and prosecuting Plaintiff.

507. Had Philadelphia adequately enforced Directive 10.3, Plaintiff would not have been subjected to repeated drive-stun applications under circumstances prohibited by the Directive and would have received the required medical evaluation and treatment following CEW exposure.

508. Had Philadelphia adequately enforced Directive 8.10, officers with a realistic and reasonable opportunity to intervene would have acted to prevent or terminate unconstitutional force.

509. Had Philadelphia adequately enforced its medical-care and detainee-monitoring obligations, Plaintiff's known CEW exposure, injuries, symptoms, and repeated requests for care would have resulted in timely assessment and treatment.

510. The City's deliberately indifferent failures therefore were an affirmative link and moving force behind Plaintiff's false arrest and imprisonment, excessive force, denial of medical care, and malicious prosecution.

511. The policies, customs, and deliberately indifferent failures alleged herein were maintained or permitted by municipal policymakers with actual or constructive knowledge of the recurring risks described above.

512. As a direct and proximate result of the City's municipal policies, customs, and deliberately indifferent failures, Plaintiff suffered loss of liberty, physical injuries, untreated pain, emotional distress, humiliation, medical expenses, reputational harm, and other compensable damages.

## COUNT X

## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW 73 P.S. §§ 201-1, et seq.

Against JPMorgan Chase Bank, N.A.

513. Plaintiff incorporates the preceding allegations by reference and does not repeat the underlying chronology.

514. Plaintiff acquired and used Chase's consumer deposit-account services primarily for personal, family, and household purposes and not for commercial or business purposes.

515. Chase engaged in deceptive conduct within the meaning of 73 P.S. § 201-2(4), including conduct creating a likelihood of confusion or misunderstanding concerning the reason for Plaintiff's account restrictions, Chase's purported verification of deposited checks, and restoration of Plaintiff's access to his accounts.

Chase's Representations Concerning Verification

516. After restricting Plaintiff's accounts, Chase repeatedly represented that resolution depended upon verification of the deposited checks and requested telephone numbers for the check issuers.

517. Plaintiff reasonably relied upon those representations by cooperating with Chase's verification process, traveling to multiple branches, communicating repeatedly with Chase representatives, and providing Chase with telephone numbers for all seven check issuers.

518. Plaintiff undertook those actions because Chase represented that providing the requested information would permit Chase to verify the checks and resolve the account restrictions.

519. Chase nevertheless continued restricting Plaintiff's access, rejected available verification methods, refused Plaintiff's offer to place an issuer directly on the telephone, and demanded that one issuer personally appear at a Chase branch despite being informed of her limited mobility.

2023 CFPB Complaint and Chase's Response

520. In 2023, Plaintiff filed a complaint with the Consumer Financial Protection Bureau ("CFPB") concerning Chase's restriction of his accounts and the practices described above.

521. In its written response to that complaint, Chase represented that it restored the funds after it had "**verified issuance of the check from the maker**" and further represented that Plaintiff's mobile-banking access had been restored as of approximately May 17, 2023.

522. Plaintiff alleges that those representations were materially false or misleading. As of May 22, 2023, Plaintiff remained unable to access Chase Mobile notwithstanding Chase's representation that access had already been restored.

523. Chase's statement that it had verified issuance with "**the maker**" was also inconsistent with the information subsequently obtained by Plaintiff concerning Chase's purported verification process.

524. Six of the seven check issuers have executed notarized affidavits stating that Chase never contacted them concerning their checks.

Subsequent CFPB and OCC Representations

525. In December 2025, Plaintiff filed a second CFPB complaint challenging Chase's prior representations and handling of his accounts.

526. Chase substantially repeated its prior explanation to the CFPB rather than correcting the challenged representations.

527. Plaintiff also filed a complaint with the Office of the Comptroller of the Currency ("OCC").

528. In responding to the OCC, Chase materially changed its description of the purported verification, stating that it had verified issuance of the "checks from the makers"—plural—rather than its earlier representation that it had verified "the check from the maker."

529. Plaintiff alleges that the later representation is materially inconsistent with Chase's earlier account and with the notarized statements of six of the seven issuers that Chase never contacted them.

530. These representations were material because Chase itself repeatedly identified issuer verification as the justification for restricting Plaintiff's funds and as the condition upon which the restrictions purportedly could be resolved.

Deceptive Conduct, Reliance, and Ascertainable Loss

531. Plaintiff does not base this claim merely upon Chase's exercise of contractual authority to investigate a transaction or restrict an account. The deceptive conduct alleged is Chase's affirmative and materially inconsistent representations concerning what verification it performed, whether it contacted the issuers, whether the verification had been completed, and whether Plaintiff's account access had actually been restored.

532. Plaintiff reasonably relied upon Chase's representations concerning the required verification process by supplying the information Chase demanded and continuing to undertake the steps Chase represented were necessary to regain access to his consumer accounts and funds.

533. Plaintiff also relied upon Chase's representations concerning the status and accessibility of his accounts in attempting to obtain and use the banking services for which he had contracted.

534. Chase possessed superior and exclusive knowledge concerning whether its employees had actually contacted any check issuer, what verification had actually occurred, and whether Chase had restored electronic access to Plaintiff's accounts.

535. Plaintiff could not independently determine Chase's internal verification activity and therefore reasonably relied upon Chase to truthfully describe the actions it represented it had taken.

536. As a direct result of Chase's deceptive practices and Plaintiff's reliance upon its purported verification process, Plaintiff remained deprived of the use and benefit of his consumer banking services and funds, incurred expenses in attempting to resolve the restrictions, and suffered an ascertainable monetary loss.

537. Plaintiff was required to make repeated telephone calls, travel to multiple Chase branches, undertake additional efforts to regain access to his accounts and funds, and ultimately return to Chase with counsel before the banking relationship could be terminated.

538. The deceptive representations also prolonged Plaintiff's efforts to determine what Chase had actually done with respect to the deposited checks and account restrictions and caused Plaintiff to incur additional out-of-pocket expenses attributable to those efforts.

539. Chase's conduct therefore constituted deceptive conduct creating a likelihood of confusion or misunderstanding within the meaning of 73 P.S. § 201-2(4)(xxi), and other applicable provisions of the UTPCPL.

540. Chase's deceptive conduct, Plaintiff's reasonable reliance thereon, and the resulting ascertainable loss entitle Plaintiff to the remedies authorized by 73 P.S. § 201-9.2.

PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Philippe E. St Juste respectfully requests that this Court enter judgment in his favor and against Defendants, as applicable to each Count, and award:

**A.** Compensatory damages in an amount to be determined at trial for Plaintiff's physical injuries, pain and suffering, emotional distress, loss of liberty, humiliation, reputational harm, loss of use of funds, economic losses, medical expenses, and other injuries proximately caused by Defendants' unlawful conduct;

**B.** Nominal damages on Plaintiff's constitutional claims to the extent permitted by law;

**C.** Punitive damages against the individual Defendants and JPMorgan Chase Bank, N.A., where supported by the evidence and permitted by law, but **not against the City of Philadelphia;**

**D.** Actual damages and, where authorized, treble damages under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-9.2;

**E.** Prejudgment and post-judgment interest to the extent permitted by law;

**F.** Reasonable costs and expenses of this action, and attorney's fees to the extent Plaintiff becomes entitled to recover them under 42 U.S.C. § 1988, the UTPCPL, or other applicable law;

**G.** Declaratory or other equitable relief to the extent appropriate and permitted by law; and

**H.** Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

Philippe E St Juste
1227 Magee Ave, Philadelphia, PA 19111
917.937.6594
philippe.esai@gmail.com

## TABLE OF CONTENTS – EXHIBITS

**Exhibit Title / Description**

**I Amended Complaint**

**Supporting Exhibits – Table 1**

| Exhibit | Description |
|---|---|
| **A** | Documents obtained on or after April 5, 2023, presented by Plaintiff at Chase branch located at 1100 Market Street on April 14, 2023 (account verification materials) |
| **B** | Additional account-related documents presented during April 14, 2023 branch visit |
| **C** | Continued verification materials submitted to Chase on April 14, 2023 |
| **D** | Final set of documents provided to Chase during April 14, 2023 branch visit |
| **E** | Copies of seven (7) checks deposited into the joint account, payable to Marie F. Verdieu and Plaintiff. Copies of the (2) checks scanned through Chase Mobile. |
| **F** | Redacted spreadsheet summarizing funeral funds received (checks and cash, net of expenses) |
| **G** | Screenshot of Chase Mobile application message displayed during Plaintiff's attempted login |
| **H** | Location history reflecting Plaintiff's visits to Chase branches on April 5, April 10–11, and April 14, 2023 |
| **I** | Call logs reflecting communications between Plaintiff and Chase on April 14, 2023 |
| **J** | Photographs documenting taser-related injuries sustained by Plaintiff |
| **K** | Emergency room records from Albert Einstein Medical Center and Penn Medicine |
| **L** | Police report containing branch manager's description of Plaintiff |
| **M** | Arrest and custody documentation relating to Plaintiff |
| **N** | Physical therapy records related to Plaintiff's post-arrest treatment |
| **O** | Phone records reflecting direct calls from Chase to Plaintiff between April 17, 2023 and late May 2023 |
| **P** | Phone records reflecting multiple calls from Chase to Plaintiff on May 3, 2023 |

| | |
|---|---|
| **Q** | Screenshot of text message exchange confirming Plaintiff's counsel as the designated point of contact for Chase |
| **R** | Voicemail message left by a Chase representative on May 11, 2023 referencing a CFPB complaint after establishing Plaintiff's counsel as point of contact |
| **S** | Account-related email statements sent by Chase between June 8, 2023 and August 25, 2023 following account closure |
| **T** | Certified docket sheet reflecting dismissal of trespass charge against Plaintiff |

**Supporting Exhibits – Table 1**

*(Exhibit A, B, C, D showing documents obtained on or after April 5th, presented at the plaintiff's April 14th visit to 1100 Market street)*

Exhibit A

WELCOME TO A BETTER BANKING EXPERIENCE

## ACCOUNT SUMMARY FOR PHILIPPE ST JUSTE

### CONTACT INFORMATION

**Address:** 180 LENOX RD
APT 5M
BROOKLYN, NY 11226-2424

**Email Address:** p.e.stjust@gmail.com

### WHAT WE DID TODAY

**Chase Total Checking®** (account number 939717226)

- For complete details on your account, refer to the documents you received today
- If you chose to receive your account-opening documents **electronically:**
  - Sign in to the Chase Mobile® app or chase.com within 4 business days. Then we'll know not to mail you the account opening documents.
- You can find the electronic versions under Statements & documents and selecting Branch Documents on chase.com.
- If you ordered checks, standard shipping is 11-14 days unless you requested expedited shipping; use your starter checks in the meantime
- Your deposit account ending in 7226 will have its own statement.

**Disney's Visa® Debit Card - "Mickey"** (account number 939717226)

- **No annual fee**
- If you received a card today, you can use it right away; if you did not receive your personalized card it will be mailed in a plain white envelope which you should receive in 7-10 days; activate right away by following instructions on the card
- Enjoy year-round Cardmember perks from Disney
- Your deposit account ending in 7226 will have its own statement.

Technology designed for you



Check out all our innovative services at **chase.com/MyChase**

*Important: This document contains confidential information including your account number. Please safeguard this document as you would a checkbook, credit card or debit card. For more information on how to protect your identity and your accounts, visit www.chase.com/identitytheft . The Deposit Account Agreement and other disclosures provided at account opening or included with your debit/credit card govern your agreement with the bank, and outline the terms & conditions associated with the products/services listed.*

Customer Initials

**Personal Banker:** QINGMEI QING
11th St and Market St
(215) 430-5759

**Date:** 04/05/2023

Deposit products provided by JPMorgan Chase Bank, N.A. Member FDIC

P.O. BOX 9050
COPPELL TX 75019

CHASE

Enclosed Card Ending In: 7786

Card Expiration Date: 05/28

This card accesses the primary accounts listed below:
CHKG ***********7226

Customer Service: 1-877-388-5726

PHILIPPE ST JUSTE
1227 MAGEE AVE
PHILADELPHIA PA 1911149410

03155
044124

Exhibit B

04062023 515 0141 0013 6120 RCM307 RF0008 RB0000 N WHT 900

# Your new Disney® Visa® Debit Card is here!




## *Activate your card today*

and enjoy year-round Cardmember perks. Visit DisneyDebit.com for complete details.

**For your protection, this card cannot be used until it has been activated.**

By using your Disney Visa Debit Card or authorizing its use, you agree that Chase may share information about you and your Disney Visa Debit Card account, including your card transactions, with Disney Credit Card Services, Inc., and each of its affiliates for their respective use thereof as permitted by applicable law.

**To activate your card, perform any ATM transaction using your PIN or call 1-877-388-5726.**

*Este documento contiene información importante de la cuenta.*
*Si tiene alguna pregunta o necesita ayuda para traducirlo, por favor llame al 1-877-388-5726.*

## *Use your card to make purchases*

in stores and online and enjoy access to our Chase ATMs:

- Withdraw cash
- Make secure deposits and get an image of your check printed right on your receipt (at select Chase ATMs)
- Check your balance
- See your recent transactions
- Transfer funds

Plus, for 24/7 banking at your fingertips, download our Chase Mobile® app.[1]

*Find more ways to simplify your banking at* ***chase.com/MyChase***

***Please see back to learn more about your Disney Debit Card*** ▶

P O BOX [illegible]
COPPELL TX 75019

CHASE

Enclosed Card Ending In: 7802

Card Expiration Date: 05/28

This card accesses the primary accounts listed below:
CHKG ***********7226

Customer Service: 1-877-388-5726

MARIE F VERDIEU
1227 MAGEE AVE
PHILADELPHIA PA 1911149410

03435
039404

Exhibit C

04062023 515 0126 0012 0606 RCM307 RF0008 RB0000 N WHT 900

# Your new Disney® Visa® Debit Card is here!




***Activate your card today*** and enjoy year-round Cardmember perks. Visit DisneyDebit.com for complete details.

**For your protection, this card cannot be used until it has been activated.**

By using your Disney Visa Debit Card or authorizing its use, you agree that Chase may share information about you and your Disney Visa Debit Card account, including your card transactions, with Disney Credit Card Services, Inc., and each of its affiliates for their respective use thereof as permitted by applicable law.

**To activate your card, perform any ATM transaction using your PIN or call 1-877-388-5726.**

*Este documento contiene información importante de la cuenta.*
*Si tiene alguna pregunta o necesita ayuda para traducirlo, por favor llame al 1-877-388-5726.*

## *Use your card to make purchases*

in stores and online and enjoy access to our Chase ATMs:

- Withdraw cash
- Make secure deposits and get an image of your check printed right on your receipt (at select Chase ATMs)
- Check your balance
- See your recent transactions
- Transfer funds

Plus, for 24/7 banking at your fingertips, download our Chase Mobile® app.[1]

*Find more ways to simplify your banking at* ***chase.com/MyChase***

***Please see back to learn more about your Disney Debit Card***

CHASE

**Thank you for choosing Chase.**

If you need to order checks, please visit Chase.com

Para hablar con un especialista de servicio de atención al cliente en español, por favor llame al 877-312-4273.

**Please keep this ID card in a safe place.**

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

**Routing Number**
083000137
**Your Account Number**
939717226

**Please keep this ID card in a safe place.**

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

**Routing Number**
083000137
**Your Account Number**
939717226

---

PHILIPPE ST JUSTE 04-23
MARIE F VERDIEU
180 LENOX RD
BROOKLYN,NY 11226-2424

97

DATE

PAY TO THE ORDER OF $

DOLLARS Security Features Included. Details on Back.

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

Exhibit D

MEMO MP

⑆083000137⑆ 939717226⑈ 0097

---

PHILIPPE ST JUSTE 04-23
MARIE F VERDIEU
180 LENOX RD
BROOKLYN,NY 11226-2424

98

DATE

PAY TO THE ORDER OF $

DOLLARS Security Features Included. Details on Back.

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO MP

⑆083000137⑆ 939717226⑈ 0098

---

PHILIPPE ST JUSTE 04-23
MARIE F VERDIEU
180 LENOX RD
BROOKLYN,NY 11226-2424

99

DATE

PAY TO THE ORDER OF $

DOLLARS Security Features Included. Details on Back.

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO MP

⑆083000137⑆ 939717226⑈ 0099

---

DEPOSIT TICKET

CHECKS AND OTHER ITEMS ARE RECEIVED FOR DEPOSIT SUBJECT TO THE PROVISIONS OF THE UNIFORM COMMERCIAL CODE OR ANY APPLICABLE COLLECTION AGREEMENT

CASH ▶

▶

▶

TOTAL FROM OTHER SIDE ▶

DATE
*DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL*

SUB TOTAL ▶

SIGN HERE FOR CASH RECEIVED (IF REQUIRED) *

* LESS CASH RECEIVED ▶

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

$

⑆503401025⑆ 939717226⑈

F67

(*Exhibit E-1 showing the 7 checks made out to Marie F Verdieu & the plaintiff*)









*(Exhibit E-2 showing the 2 checks deposited via Chase Mobile and not handed over to Michael)*



(*Exhibit F showing the money received [checks & cash minus expenses] at the plaintiff mother's funeral redacted in an excel sheet*)

| | Value | Method | Status | Remaining | Received | |
|---|---|---|---|---|---|---|
| Huguette Antoine | 500 | Zelle | | 500 | | Margael |
| Myrlande Jean-Philippe | 250 | Zelle | | 250 | | Margael |
| Furdine Verneret | 200 | Zelle | | 200 | | Christie |
| Amos Saint Juste | 1100 | Cash | | 1100 | | Philippe |
| Rita Figareau | 280 | Flower purchase | -280 | | | Philippe |
| Shekina SDA | 400 | Check | -400 | | | Margael |
| Shekina SDA | 500 | Check | | 500 | 500 | Margael |
| Shekina SDA | 250 | Flower purchase | -250 | | | Margael |
| Frere Guerrier | 300 | Food services | -300 | | | Philippe |
| Jenny Laguerre | | | | | | Philippe |
| Soeur Cecile | 300 | Food services | -300 | | | Margael |
| Jean & Joceline Baudoin | 300 | Food services | -300 | | | |
| Edwin Edouard | 100 | Check | | 100 | | Philippe |
| Marie Renee Lucama | 200 | Cash to Matante Marie | | 200 | 200 | Margael |
| Nancy Jean-Pierre | 100 | Cash to Matante Marie | | 100 | 100 | |
| Premier Eglise Methodist Unie | 500 | Check to Matante Marie | | 500 | 500 | Margael |
| Solange Casseus | 100 | Cash to Matante Marie | | 100 | 100 | |
| Antonio Laborde | 100 | Cash to Matante Marie | | 100 | 100 | |
| Yanick Lambert Dauphin | 100 | Cash | | 100 | 100 | |
| Frere Mannassé | 500 | Cash to Matante Marie | | 500 | 500 | Margael |
| Promotion Ecole des Infirmieres 1 | 2168 | Cash | | 2168 | 2168 | Margael |
| Agnes Francois Lachaud | 200 | Check to Matante Marie | | 200 | 200 | Margael |
| Resia & Sylvio Duma | 100 | Cash | | 100 | 100 | |
| Louines Chapron | 200 | Check to Matante Marie | | 200 | 200 | Margael |
| Anne & Renand Rochelin | 400 | Cash | | 400 | 400 | Margael |
| Katie Volmar & Barbara | 300 | Cash | | 300 | 300 | |
| Denise Jeune | 150 | Cash | | 150 | 150 | |
| Myrlande Thelusma | 150 | Cash | | 150 | 150 | Margael |
| Fito Adonis | 400 | Cash | | 400 | 400 | Margael |
| Marie Alberte & Alain Pierre | 500 | Check | | 500 | 500 | Margael |
| Gladys Joseph & Sonia Joseph | 200 | Cash | | 200 | 200 | |
| Mona & Marc Belizaire | 150 | Cash | | 150 | 150 | |
| Marie Edithe Gu (Chouchou) | 200 | Check | | 200 | 200 | Margael |
| Micheline Bertin | 100 | Cash | | 100 | 100 | |
| Lisette & Guatty Thelusma | 200 | Cash to Matante Marie | | 200 | 200 | Margael |
| Bon Samaritain | 100 | Cash to Matante Marie | | 100 | 100 | |
| Huguette Antoine | 100 | Zelle to Matante Marie | | 100 | | Margael |
| Groupe des Dames | 550 | Cash to Matante Marie | | 550 | 550 | Margael |
| Miss Camille | 200 | Cash | | 200 | 200 | Margael |
| Ginette & Denise Badou | 500 | Cash | | 500 | 500 | Margael |
| Marie Lourdes Joseph | 300 | Check | | 300 | 300 | Margael |
| Flambert Cousseillant | 200 | Cash | | 200 | 200 | Margael |
| Tom Jacquet | 360 | Cash | | 360 | 360 | Margael |
| Rose Adrien | 1000 | Cash | | 1000 | 1000 | |
| Rosemene Gedeon | | | | | | |
| Ashton Chevalier | | | | | | |
| Stephanie Sejour | | | | | | |
| Caleb Pierre | | | | | | Margael |
| Total | | | | 10428 | 10728 | |
| | 12978 | | | | | |

(*Exhibit G showing homepage message from Chase Mobile when the plaintiff attempted to log into his Chase Mobile account*)



*(Exhibit H showing Google Maps tracking of plaintiff visit to Fulton Street and Myrtle Ave Chase Branches on April 10th and 11th, 2023 and 1100 Market on April 5th and 14th)*




*(Exhibit I showing the various calls made between the plaintiff and Chase on Friday April 14th)*



(*Exhibit J showing the taser injuries sustained by the plaintiff*)





(*Exhibit K showing the Emergency Room reports from Albert Einstein Medical Center and Penn Medicine of plaintiffs injuries* )

Einstein HEALTHCARE NETWORK
More than Medicine

**Patient Name**
ST JUSTE, PHILIPPE
**Date of Birth**
5/28/1989
**Visit Location Information**
**Albert Einstein Medical Center**
**5501 Old York Road**
**Philadelphia, PA, 19141**
**(215) 456-7890**
**Fax: (215) 455-1933**

Exhibit K

MRN: 100515147
FIN: 44470577
Location: Albert Einstein Medical Center
Registration Date and Time: 04/18/2023 19:45 EDT
Primary Care Physician: None, None

Einstein Healthcare Network thanks you for trusting us with your healthcare needs. The following includes patient education materials and information regarding your injury/illness. Please take these Discharge Instructions and all of your medications to your follow-up appointments.

# Patient Discharge Instructions

**ED Attending Provider:**
**ED Resident/NP/PA:**
MacArthur, Patrick
**Primary Care Provider:**
None, None

**Your Diagnosis**
Cough
Back strain
Taser injury
Back injury

Your exam and treatment during this visit were done for an urgent reason. This visit does not replace complete and regular care from your family doctor.
Please return if needed. It is important to also follow-up with your family doctor or clinic when possible. We are here to help you during times of emergency need.

**Discharge Vitals**
**Temperature** (Oral)
36.6 °C
**Heart Rate** (Monitored)
76
**Respiratory Rate**
18
**Blood Pressure**
126/69
**SpO2**
96%
**Weight**
75 kg

**Please Call to Schedule these Appointments**

| With | When | Contact Information |
|---|---|---|
| Healthcare Center #10 215-685-0603 | | |
| Additional Instructions: | | |
| None, None | Within 3 to 5 days | |
| Additional Instructions: Call for followup appointment | | |

Printed on: 04/18/2023 22:05 EDT

# Allergies and Medications

**Allergies**
No Known Medication Allergies

These are the lists of medications that you should **TAKE** or **STOP** after you leave the hospital.
If you have questions about these medication instructions or intend to take other medications that you have at home, please discuss this with your physician.

**Medications**

| | What | How Much | When | Instructions | Next Dose |
|---|---|---|---|---|---|
| ***New*** | bacitracin topical (bacitracin zinc 500 units/ g topical ointment) | 1 Application Topical | Twice a day | Duration: 7 Days<br>Printed Prescription | |
| ***New*** | ibuprofen (ibuprofen 600 mg oral tablet) | 1 Tabs Oral | Every 6 hours | Duration: 5 Days<br>Printed Prescription | |
| ***New*** | lidocaine topical (lidocaine 5% topical film) | 1 Patches Topical | At bedtime | Duration: 7 Days<br>remove patches after 12 hours<br><br>Printed Prescription | |

**Safe Medication Use Starts with YOU!**

- Keep an up-to-date list of all the medications you take and carry it with you.
- Make sure your list includes both prescription and over-the-counter medications or supplements with how much you take and when you take them.
- Update your list whenever changes are made to your medications.
- Share your medication list every time you see your doctor, nurse, pharmacist or other healthcare provider.

# What To Do Next

**Instructions from your Doctor**

You were seen in the ED for evaluation of your taser injury to your skin and the muscles underneath, you also had a cough. We tested you for flu and COVID and you should get those results tomorrow, in the meantime your skin looks uninfected and your pain is most likely due to muscle strain caused by the electricity from the taser, this should get better over the next week and in the meantime take ibuprofen, stretch the area, and apply heat as needed. Please make appointment to follow-up with your primary care doctor in the next few days to a week for reevaluation of your injuries, and if you start developing

fevers, difficulty breathing, significant darkening of your urine, or any other concerning symptoms, please come back into the ED for evaluation. Otherwise please follow-up with your primary care doctor, take the medications as prescribed, rest and recover.

## Tests This Visit

All **electrocardiogram (EKG)** and radiology studies done in the Emergency Department are reviewed by a heart doctor (cardiologist) and/or x-ray doctor (radiologist). If there is new information after the review, you or your doctor will be contacted by phone or letter.

**HIV & Hepatitis C Screening Is Important for Everyone**. If you were tested for HIV or Hepatitis C during your visit today, results will be available within a few business days. If the results are positive, you will be contacted by staff with the result, information, and referral for treatment. Both conditions are easily and effectively treated at Einstein.

If you were not tested and would like to be tested, contact your primary care physician.

To inquire about HIV test results, you may leave a message at the confidential Patient Test Result line at 215-456-7568. To inquire about Hepatitis C test results, you may leave a message at confidential Hepatitis C line at 215-456-5729. You will receive a call back within 24 hours or on the next business day. Results will not be given out or left as a voice mail message.

## Immunizations This Visit

## Your Medical History

# AFTER VISIT SUMMARY

Penn Medicine

**Philippe St Juste** DoB: 5/28/1989

4/22/2023 PAH Emergency Department 215-829-3358

## Instructions

Your personalized instructions can be found at the end of this document.

### Read the attached information

1. Cough (English)
2. Back: Strain (English)

### Call Wood Clinic Resident

Specialty: Family Medicine

## Today's Visit

Your Treatment team today included: Jenice Leticia Baker, MD

**Diagnoses**

- Cough
- Low back sprain

### Imaging Tests

XR CHEST 2 VIEWS

### Medications Given

ibuprofen Last given at 11:19 AM

| Blood Pressure | Temperature (Oral) | Pulse | Respiration |
| --- | --- | --- | --- |
| 136/80 | 98.2 °F | 78 | 16 |

Oxygen Saturation
100%

## What's Next

You currently have no upcoming appointments scheduled.

## Assistance for future appointments

For assistance with scheduling a follow-up appointment with a Penn Medicine physician, please call 215-829-3383 and indicate that you were seen in the Emergency Department.

*(Exhibit L showing the branch manager description of the plaintiff)*

**Philadelphia Police Department**
**Central Detective Division**
**Investigation Interview Record**

| | | | | | |
|---|---|---|---|---|---|
| Case No.: 23- | | | | | |
| Interviewer: Det McCaffery # 980 | | | | | |
| Name: Mecca Abdullah | Age: 32 | Race: Black | Sex: Female | Dob: 11/16/1990 | |
| Address: 1100 Market St | City: Philadelphia | State: PA | Zip Code: 19121 | Phone Number: 215 430 5769 | |
| Name of Employer/School: Chase Bank | Soc. Sec. No.: | | Cellular Phone Number: | | |
| Address of Employer/School: | Department: | | Work Phone Number: | | |
| Name of Closest Relative: | Address of Relative: | | Phone Number: | | |
| Place of Interview: Central Detectives | Date of Interview: 4/14/2023 | | Time of Interview: 6:30 pm | | |
| We are questioning you concerning: A Defiant Trespass that occurred at 1100 Market St on 4/14/2023 at approximately 5:20 pm | | | | | |

Q. I am Detective McCaffery. Can you tell me what happened today?
A. A client came in around 3:30 pm. The account was restricted because due to check deposits. We were unable to verify the checks. W told the client that the person who wrote the checks would need to come in to verify the checks. The client was being belligerent and stating that he was not leaving without his money. He refused to leave and we said we were going to call the police. An officer showed up and explained to him that he was going to be arrested if he did not leave. He still refused so the officer arrested the male.
Q. Do you know the clients name?
A. Phillippe St Juste.
Q. Can you describe the male?
A. He was a tall black male, slender. About 6'3". He had an accent.
Q. How many times was he asked to leave?
A. He was asked to leave about 10 times over the course of an hour.
Q. What is your position at the bank?
A. I am the branch manager.
Q. Is there anything else that you would like to add to this interview?
A. No

(*Exhibit M showing plaintiff arrest documentation*)

PHILADELPHIA MUNICIPAL COURT

NON-TRAFFIC STATUTORY SUMMARY OFFENSES

# CITATION

2306016505

PA SID: 53870481 **PID:** 1237427

DC#: 23-06-016505-01 PSA: 2 Crime Code: 90J Desc: Tresspass of Real Property

COMMONWEALTH VS.
Defendant: ST JUSTE, PHILLIPPE
231 Spencer ST.
Brooklyn, NY 11234 PID: 1237427
Sex: Male DOB: 5/28/1989 Age: 33 Race: Black

Arrest Date / Time: 4/14/23 6:30 PM
Inside/Outside: I
Loc. 1100 Market ST.
Philadelphia, PA 19107
Docket #: MC51-SU-0001113-2023

Complainant Name:
ABDULLAH, MECCA

| Charges: | OC Description | Grade | Count |
|---|---|---|---|
| CC3503B | DEFIANT TRESPASS | S | 001 |

**NATURE OF THE OFFENSE**
On (day, date and time) Friday 04/14/2023 05:45 PM at (Incident Loc.) 1100 MARKET ST.
in the County of Philadelphia, the accused committed the following acts: (description of acts and specification of statute and sector number thereof)

ON 4/14/23 AT APPROXIMATELY 5:45 PM WHILE WORKING AN OVERTIME DETAIL AT TJ MAXX ON FOOT AS CALL SIGN CFB10 THE OFFICER WAS APPROACHED BY A FEMALE EMPLOYEE FROM CHASE BANK LOCATED AT 1100 MARKET ST WHO STATED THAT THEY WERE HAVING TROUBLE WITH A MALE REFUSING TO LEAVE THE BANK AFTER CLOSING HOURS. UPON ARRIVAL THE OFFICER MET WITH THE BRANCH MANAGER OF THE BANK WHO STATED THE DEFENDANT WANTED TO WITHDRAWAL HIS MONEY BUT DID NOT HAVE THE PROPER VERIFICATION. THE DEFENDANT WAS TOLD TO LEAVE APPROXIMATELY 10 TIMES OVER 30 MINUTES BY THE BANK MANAGER AND POLICE. WHILE ATTEMPTING TO ESCORT THE DEFENDANT OUT OF THE BANK HE FELL TO THE FLOOR AND HE CLENCHED HIS FIST REFUSING TO GET HAND CUFFED. WHILE THE DEFENDANT WAS IN THE SITTING POSITION HE REFUSED TO PUT HIS HANDS BEHIND HIS BACK. DEFENDANT WAS TAZED IN THE BACK TO COMPLY. THE MALE WAS THEN HANDCUFFED AND TRANSPORTED TO CENTRAL DETECTIVES FOR FURTHER INVESTIGATION.

The facts set forth in this citation are true and correct to my personal knowledge or information and belief, and any false statements therein are made subject to the penalties of Section 4904 of the Crimes Code (18 Pa. C.S. §4904), relating to unsworn falsification to authorities.

| Officer Name | Payroll# | Badge | UNIT | Platoon/Group | SCH. VAC. |
|---|---|---|---|---|---|
| CURTOSI JR ANTH | [redacted] | 7001 | 4500 | 2 E | 4/17/2023 to 4/17/2023 |

Operations Room Supervisor's Signature

Officer's Signature

**YOU ARE REQUIRED BY LAW TO APPEAR ON THE FOLLOWING ARRAIGNMENT OR TRIAL DATE**

5/1/2023 (Date) 404: 1301 Filbert Street, Stout Ctr 2:00 p.m. (Address)

At such time and place you may be found "Guilty", "Not Guilty" or "Enroll in the Summary Diversion Program".

**FAILURE TO APPEAR SHALL CONSTITUTE CONSENT TO A TRIAL IN YOUR ABSENCE. IF YOU ARE FOUND GUILTY AT TRIAL, YOU SHALL HAVE THE RIGHT TO FILE AN APPEALWITHIN 30 DAYS FOR A TRIAL DE NOVO IN THE COURT OF COMMON PLEAS.**

**JUVENILES MUST APPEAR WITH A PARENT OR LEGAL GUARDIAN AT THE REFERENCED COURT HEARING. FAILURE TO DO SO MAY RESULT IN THE ISSUANCE OF A BENCH WARRANT.**

Defendant's Signature

Parent's (Guardian's) Signature

**NOTICE TO DEFENDANT:** The defendant must provide written notice to the Court of any change of address within 48 hours of the date of change.

Plea: ☐ Guilty ☐ Not Guilty

☐ Guilty ☐ Not Guilty ☐ Discharged
☐ Discharged L.O.P. ☐ Withdrawn

(ADA Signature)

I voluntarily and understandingly plead guilty and waive my right to counsel.

(Defendant's Signature)

Fine $
Cost $
VCF $
DAF $
SAF $
TOTAL $

Comm. Service Hrs:
Status Date

Restitution
Status Date

Pay By ____ ____ Days in County Prison

The First Judicial District complies with the American with Disabilities Act. If you have a disability and require reasonable accommodations, please call 215-683-7272.

Judge:
(Given Under My Hand and Seal) (Date)

PHILADELPHIA POLICE DEPARTMENT

# COMPLAINT OR INCIDENT REPORT

| YEAR | DIST./OCC. | D.C. No. | SECT. | DIST. | VEH. NO. | REPORT DATE |
|---|---|---|---|---|---|---|
| 23 | 6 | 16505 | | 6 | 630 | 4/14/23 |

| CRIME OR INCIDENT CLASSIFICATION | CODE | TIME OUT A / P | TIME IN A / P |
|---|---|---|---|
| Trespassing (Defiant) | 905 | 540 (P) | |

| LOCATION OF OCCURRENCE | ☐ IN ☐ OUT | TYPE OF PREM. |
|---|---|---|
| 1100 Market St | | 034 |

| DATE OF OCCUR. | DAY CODE | TIME OF OCCUR. A / P | NATURE OF INJURY |
|---|---|---|---|
| 4/14/23 | 5 | 330 (P) | — |

| COMPLAINANT | AGE | RACE | SEX | PHONE (HOME) |
|---|---|---|---|---|
| Chase Bank | | | | |

| ADDRESS | PHONE (BUSINESS) |
|---|---|
| 1100 Market St | |

| FOUNDED | REPORT TO FOLLOW | UNIT | CODE | INV. CONT NO. |
|---|---|---|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No ☐ Close Out | | | 3602 |

| WITNESS | TRACEABLE PROP. | UNIQUE DESCRIPTION OF OFFENDER | OTHER EVIDENCE |
|---|---|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |

DESCRIPTION OF INCIDENT *(Include Description of Crime Scene if Applicable)*

R Defiant Trespassing
Mecca Abdullah - Branch
manager for above states below
male Refused to leave Bank
after closing. Below male taken
into custody for defiant
Trespassing. Trans to CDO.

| WITNESS | ADDRESS | PHONE NUMBER |
|---|---|---|
| off. told by Police | [illegible] to leave multiple times | |

OFFENDER INFORMATION

[illegible] Emmanuel 5/28/[illegible]
PIO [illegible] 4067 [illegible] male before custody

| PROPERTY DESCRIPTION *(Include Make, Model, Color and Serial No. Where Applicable)* | PROP. CODE | INSURED | STOLEN VALUE |
|---|---|---|---|
| | | ☐ Yes ☐ No | $ |

Passport # 66[illegible]19934
Bank closed at 5:00p
male was told to leave several
times by Bank Employees and Police

DC NO.

| VEHICLE 1 — OWNER'S NAME | VEHICLE 2 — OWNER'S NAME |
|---|---|
| | |

| VEHICLE 1 — OPERATOR'S NAME | VEHICLE 2 — OPERATOR'S NAME |
|---|---|
| | |

| WANTED/STOLEN MESSAGE SENT General No. Date | DIST./UNIT TERMINAL | RECEIPT NO. | SENT BY |
|---|---|---|---|
| | | | |

| REPORT PREPARED BY | NO. | DIST./UNIT | TOTAL PAGES | PAGE NO. |
|---|---|---|---|---|
| Santos [redacted] | 7801 | CCD | 1 | 1 |

| REVIEWED BY | NO. | DIST./UNIT | REFERRAL DATE | CEN NO. |
|---|---|---|---|---|
| | | | | |

PURSUANT TO ACT 155 OF 1992, THE BELOW PERSON ACKNOWLEDGES RECEIPT OF THE NOTIFICATION OF VICTIM SERVICES FORM:

75-48 Front (Rev. 11/09)

# Philadelphia Police Department
## Central Detective Division
## Investigation Interview Record

| | | | | |
|---|---|---|---|---|
| Case No.: 23- | | | | |
| Interviewer: **Det McCaffery # 980** | | | | |
| Name: **Mecca Abdullah** | Age: **32** | Race: **Black** | Sex: **Female** | Dob: **11/16/1990** |
| Address: **1100 Market St** | City: **Philadelphia** | State: **PA** | Zip Code: **19121** | Phone Number: **215 430 5769** |
| Name of Employer/School: **Chase Bank** | Soc. Sec. No: | | Cellular Phone Number: | |
| Address of Employer/School: | Department: | | Work Phone Number: | |
| Name of Closest Relative: | Address of Relative: | | Phone Number: | |
| Place of Interview: **Central Detectives** | Date of Interview: **4/14/2023** | | Time of Interview: **6:30 pm** | |
| We are questioning you concerning: **A Defiant Trespass that occurred at 1100 Market St on 4/14/2023 at approximately 5:20 pm** | | | | |

Q. I am Detective McCaffery. Can you tell me what happened today?

A. A client came in around 3:30 pm. The account was restricted because due to check deposits. We were unable to verify the checks. W told the client that the person who wrote the checks would need to come in to verify the checks. The client was being belligerent and stating that he was not leaving without his money. He refused to leave and we said we were going to call the police. An officer showed up and explained to him that he was going to be arrested if he did not leave. He still refused so the officer arrested the male.

Q. Do you know the clients name?

A. Phillippe St Juste.

Q. Can you describe the male?

A. He was a tall black male, slender. About 6'3". He had an accent.

Q. How many times was he asked to leave?

A. He was asked to leave about 10 times over the course of an hour.

Q. What is your position at the bank?

A. I am the branch manager.

Q. Is there anything else that you would like to add to this interview?

A. No

Signature: [signature] Date: 4/14/23

Philadelphia Police (75-483)

# Arrest Memo

District: 6 RPC # CB10 DC#22-06-016511 Sector: 2 Date:04/14/2023 Time Of Assignment: 5:47pm
Time Of Occurrence: 3:30pm Location Of Occurrence: 1100 Market St.t In / Out: IN
Location Of Arrest: 1100 Market Stt Time Of Arrest: 6:30PM Type of Assignment: Pedestrian

---

Arresting Officer: Curtosi Badge 7001 District: Center City District
Squad/Group 5 Squad Vacation From 6/8/23 To 7/14/23 Pr. # 206105

Arresting Officer: Badge: District:
Squad/Group5 Squad Vacation from To Pr. #

Complainant:Mecca Abdullah Age:39 Race:B Sex: Female Address:1100 Market Stt Phone#
Witness: Address: Phone#

---

Defendant: Philipe Emmanual Age: DOB: Race B Sex: Male Address:

Defendant: Age: DOB: Race Sex: Male Address:

Defendant: Age: DOB: Race Sex: Female Address:

---

Property receipt # Item:
Property receipt # Item:
Property receipt # Item:

---

## Details Of Arrest

On 4/14/23 I was working an overtime detail at TJ MAXX on foot as call sign CFB10 when a female employee from Chase Bank walked in stating that they were having trouble with a male refusing to leave the bank after closing hours. Upon arrival I met with the Branch manager of the bank Mecca Abdullah she stated the male wanted to withdrawl his money but did not have the proper verification. The male was told to leave several times by the bank manager and police. I was attempting to escort the male out of the bank when he fell to the floor and he clenched his fist refusing to get hand cuffed. While the male was in the sitting position and refused to put his hands behind his back. Police Officer Leonard #4067 tazed the male in the back to comply. The male was then handcuffed and transported to Central Detectives for further investigation.

POLICE
HONOR SERVICE INTEGRITY

# ADULT PRISONER FLOW CHART

| | |
|---|---|
| Date: | 1 / 14 / 23 |
| DC # | 23-06-016505 |
| CBN # | |
| PPN # | |
| Time of Arrest: | 5150 ☐ AM ☑ PM |
| Reason for Arrest: | Tresspassing |

## Detainee Information

| Name (Last) | Name (First) | DOB | Sex | Identifies as (Gender Identity) |
|---|---|---|---|---|
| ST. Juste | Philippe | 5-28-39 | Male ☑ Female ☐ | male |

## Arresting Officer / s

| Rank | Name | Badge # | Payroll | Call Sign | District | Unit |
|---|---|---|---|---|---|---|
| P/O | ~~Cotos~~ Curtosi | 7001 ~~7000~~ | [redacted] | CF310 | CCD | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Police Transported Subject ☑ Yes ☐ No Vehicle # 601

Subject Searched PRIOR to Police Transport ☑ Yes ☐ No Badge # 5114

Subject Secured with Restraints ☐ Back ☐ Front ☐ Legs Badge #

Vehicle Searched PRIOR to Police Transport ☑ Yes ☐ No Badge # 5114

Subject Seat Belted in ☑ Yes ☐ No Badge # 5114

Subject Searched AFTER to Police Transport ☑ Yes ☐ No Badge # 5114

Vehicle Searched AFTER Police Transport ☑ Yes ☐ No Badge # 5114

Weapons Secured PRIOR to Entry into DBC/TH ☐ Yes ☐ No

Security Concerns Conveyed to DBC/TH ☐ Yes ☐ No Badge #

Security Concerns: ☐ Violent ☐ Suicidal ☐ Escape Risk ☐ Aggressive ☐ Intoxicated ☐ Deaf / Hearing Impaired ☐ Medical ☐ Disabled ☐ Wheelchair required (PDAV Used) ☐ Other:

Identifiable Attributes: ☐ Trama ☐ Bruises ☐ Scars ☐ Tattoos ☐ Other ☐ N/A Describe:

## Transportation Officer / If Different from Arresting

Temporary Holding (TH) will be Checked BEFORE and AFTER use: ☐ Yes ☐ No

Transported to PDU for: Diabetic ☐ DUI ☐

| Rank | Name | Badge # | Payroll | Call Sign | District | Unit |
|---|---|---|---|---|---|---|
| P/O | Grier | 5114 | [redacted] | 601 | 6th | |
| P/O | MARRIGAN | 4413 | [redacted] | 601 | 6th | |
| | | | | | | |
| | | | | | | |

If Detainee is Transported to the Hospital, list the Hospital's Name and Reason for Visit and Hospital Case DC #:

Additional Detainee Information:

75-582 (Rev. 4/17)

# BIOGRAPHICAL INFORMATION REPORT

☑ ARREST ☐ INVESTIGATION ☐ OTHER

(CHECK BLOCKS WHERE DOCUMENTATION EXISTS)

PHILADELPHIA POLICE DEPARTMENT

| | |
|---|---|
| DATE | 4-14-23 |
| TIME | 5:50p |
| LOCATION OF INITIAL CONTACT | 1100 Market St |
| DISTRICT | 6th |
| D.C. NO. | 23-06-016505 |
| NAME — LAST | ST. Juste |
| FIRST | Philippe |
| MIDDLE | |
| D.O.B. | 5-23-89 |
| SEX | male |
| RACE | Blk |
| HEIGHT | 5'10 |
| WEIGHT | 170 |
| HAIR COLOR | Blk |
| EYE COLOR | BRN |
| COMPLEXION | Med |
| BUILD | Thin |
| GLASSES (YES/NO) | No |
| FACIAL HAIR | |
| NICKNAME | UNK |
| ALIASES | UNK |
| MARITAL STATUS | |
| RESIDENCE STREET NUMBER/NAME | 231 Spencer st Apt 3 |
| CITY/STATE (OTHER THAN PHILA.) | Brooklyn NY |
| DIST. | |
| TYPE OF RESIDENCE | |
| RESIDES WITH | |
| DRIVER NUMBER | 306008733 |
| STATE | NY |
| SOCIAL SECURITY NUMBER | |
| OCCUPATION | ~~Unk~~ UNK |
| EMPLOYER/ADDRESS | |
| PLACE OF BIRTH/CITY, STATE | |
| GROUP AFFILIATION | |
| ETHNIC BACKGROUND | |
| SCARS, TATTOOS, DEFORMITIES | |
| CLOTHING DESCRIPTION | Blue Shirt w/ White Collar; Black Pants; Black Sneakers |
| JEWELRY WORK | |

VEHICLE INFORMATION

| | YEAR | MAKE | MODEL | COLOR | STATE | TAG | VIN |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |

| | OWNER-LAST NAME, FIRST | ADDRESS | CITY | STATE |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |

| MODUS OPERANDI (METHODS, TRAITS, ETC.) | AREAS FREQUENTED |
|---|---|
| | |

75-229 (Rev 3/92)

AREAS MARKED WITH ► MUST BE FILLED IN.
CHECK RELIABILITY BOXES WHEN APPROPRIATE

## RELATIVES

| | | | | | |
|---|---|---|---|---|---|
| SPOUSE | LAST | MAIDEN | FIRST | ADDRESS | CITY/STATE |
| MOTHER | LAST | MAIDEN | FIRST | ADDRESS | CITY/STATE |
| FATHER | LAST | FIRST | | ADDRESS | CITY/STATE |
| BROTHER SISTER | | | | | |
| BROTHER SISTER | | | | | |
| BROTHER SISTER | | | | | |

## ASSOCIATES

| LAST NAME | FIRST NAME | ADDRESS | CITY/STATE | PPN |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## EDUCATION

| SCHOOL | ADDRESS | CITY/STATE | YEARS |
|---|---|---|---|
| | | | |
| | | | |

## CRIMINAL RECORD INFORMATION

| | | | |
|---|---|---|---|
| PPN | FBI NUMBER | PA NUMBER | OTHER NUMBER *(STATE, IMMIGRATION)* |
| PAROLE NUMBER | PAROLE OFFICER | | TELEPHONE NUMBER(S) |
| PROBATION NUMBER | PROBATION OFFICER | | TELEPHONE NUMBER (S) |

CHIEF CRIMINAL ACTIVITY

| | | | |
|---|---|---|---|
| INITIATING OFFICER, LAST NAME | BADGE | RANK | DISTRICT/UNIT/PLATOON |
| ASSIGNED INVESTIGATION | BADGE | RANK | DISTRICT/UNIT PLATOON |

## ADDITIONAL REMARKS

75-229 (Reverse) (Rev. 3/92)

[redacted]

PHILADELPHIA POLICE DEPARTMENT

# COMPLAINT OR INCIDENT REPORT

| YEAR | DIST./OCC. | D.C. No. | SECT. | DIST. | VEH. NO. | REPORT DATE |
|---|---|---|---|---|---|---|
| 23 | 6 | 16505 | | 6 | FB10 | 4/14/23 |

| CRIME OR INCIDENT CLASSIFICATION | CODE | TIME OUT A/P | TIME IN A/P |
|---|---|---|---|
| Trespassing (Defiant) | 905 | 542 (P) | |

| LOCATION OF OCCURRENCE | ☒ IN ☐ OUT | TYPE OF PREM. |
|---|---|---|
| 1100 Market St | IN | 034 |

| DATE OF OCCUR. | DAY CODE | TIME OF OCCUR. A/P | NATURE OF INJURY |
|---|---|---|---|
| 4/14/23 | 5 | 330 (P) | — |

| COMPLAINANT | AGE | RACE | SEX | PHONE (HOME) |
|---|---|---|---|---|
| Chase Bank | | | | 215-430-5759 |

| ADDRESS | PHONE (BUSINESS) |
|---|---|
| 1100 Market St | |

| FOUNDED | REPORT TO FOLLOW | UNIT | CODE | INV. CONT NO. |
|---|---|---|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No ☐ Close Out | | | |

| WITNESS | TRACEABLE PROP. | UNIQUE DESCRIPTION OF OFFENDER | OTHER EVIDENCE |
|---|---|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |

DESCRIPTION OF INCIDENT *(Include Description of Crime Scene if Applicable)*

P - Defiant Tresspassing
Mecca Abdullah, - Branch
manager for above states below
male refused to leave Bank
after closing. Below male taken
into custody for defiant
Tresspassing - Trans to CDD.

| WITNESS | ADDRESS | PHONE NUMBER |
|---|---|---|
| Off. told by Police & Comp to leave multiple times. | | |

OFFENDER INFORMATION
Ohafe Emmanuel 5/28/84
P/O Leonard 4067 Day Stunned male before Custody

| PROPERTY DESCRIPTION *(Include Make, Model, Color and Serial No. Where Applicable)* | PROP. CODE | INSURED | STOLEN VALUE |
|---|---|---|---|
| | | ☐ Yes ☐ No | $ |

Passport # 6688194341
Bank closed At 5'0P
male was Told to leave several
Times by Bank Employees and Police.

DC NO.

| VEHICLE 1 — OWNER'S NAME | VEHICLE 2 — OWNER'S NAME |
|---|---|
| | |

| VEHICLE 1 — OPERATOR'S NAME | VEHICLE 2 — OPERATOR'S NAME |
|---|---|
| | |

| WANTED/STOLEN MESSAGE SENT General No. Date | DIST./UNIT TERMINAL | RECEIPT NO. | SENT BY |
|---|---|---|---|
| | | | |

| REPORT PREPARED BY | NO. | DIST./UNIT | TOTAL PAGES | PAGE NO. |
|---|---|---|---|---|
| Cantose [redacted] | 7801 | CD | 1 | 1 |

| REVIEWED BY | NO. | DIST./UNIT | REFERRAL DATE | CEN NO. |
|---|---|---|---|---|
| | | | | |

PURSUANT TO ACT 155 OF 1992, THE BELOW PERSON ACKNOWLEDGES RECEIPT OF THE NOTIFICATION OF VICTIM SERVICES FORM:

75-48 Front (Rev. 11/09)

(*Exhibit N showing the plaintiff physical therapy report*)

**Adex Physical Therapy, P.C**

35 East 51st Street
Brooklyn NY 11203
Tel#: (718) 363 2556 Fax#: (718) 363 2677
Email#: adexphysicalt1@optonline.net

# Initial Evaluation

| | | | | |
|---|---|---|---|---|
| **Patient Name:** | Phillippe Saint Juste | | **Date Seen:** | 4/28/2023 |
| **Diagnosis:** | S23.3XXA | Sprain of ligaments of thoracic spine, initial encounter | **Referring Physician:** | Jerry Uduevbo |
| | M54.6 | Pain in thoracic spine | | |
| | M25.60 | Stiffness of unspecified joint, not elsewhere classified | | |
| | M62.81 | Muscle weakness (generalized) | | |

Exhibit N

## Subjective

### Current Condition

**Details**

Chief Complaint: The patient is a 33 year old who recently was attacked from his upper back after a police altercation. Patient reported feeling increased upper back pain and discomfort post incident for the past 2 weeks. Patient presents with thoracolumbar joint pain, stiffness, muscle weakness, and limited with all functional ADLs and IADLs.

Onset Date: Last 2 weeks

Type of Injury: New injury

Occupation: Educator/Mentor

**Treatments**

| Type | Start Date | End Date | Outcome |
|---|---|---|---|
| Primary Physician | 4/26/2023 | 4/26/2023 | No Change |

### Pain History

**Pain Area**

| Area | Current | Best | Worst |
|---|---|---|---|
| Thoracic Spine | 7/10 | 6/10 | 8/10 |

**Pain Description**

| Area | Activity/Time | Symptoms | Descriptions |
|---|---|---|---|
| Thoracic Spine | Bending, Lifting, Reaching, Working, Sitting | Increased | Deep, Burning, Aching, Radiates, Stiff |

### Functional Status

| Functional Activity | Status | Level |
|---|---|---|
| Working | Moderate Limitation | Current |
| Recreational Exercise | Moderate Limitation | Current |
| Sitting | Moderate Limitation | Current |
| Bending | Moderate Limitation | Current |
| Reaching | Moderate Limitation | Current |
| Dressing | Moderate Limitation | Current |
| Bathing | Moderate Limitation | Current |

Currently Working: Yes

**Medical History**

| Surgery |
|---|
| None per patient |

| Condition |
|---|
| None per patient |
| Allergies NKDA |

| Medication | Classification | Status |
|---|---|---|
| Ibuprofen | Pain Reliever | Currently Taking |
| Lidocaine | Pain Reliever | Currently Taking |
| Bacitracin Zinc | Pain Reliever | Currently Taking |

Patient is healthy and denies and surgical history.

**Social and Family History**

**Social History/Living Environment:** The patient lives alone in his apartment building on the 5th floor with elevator accesibility with no steps to enter.

Non smoker

Non alcoholic

**Family History:** None contributory to the patients present complaints.

**Outcomes**

| Test | Score | Note |
|---|---|---|
| Oswestry | 24 | 48% |

## Objective

**Observation**

Patient has forward head position with forward shoulder positioning.

**Vital Signs**

| Vital Sign | Finding |
|---|---|
| Blood Pressure | 121/82 |
| Heart Rate | 64 bpm |
| Height | 6.2 ft |
| Weight | 155 lbs. |
| BMI | 19.8 |

**T-Spine**

**T-Spine - Active Range Of Motion**

| Motion | AROM | Gross Strength |
|---|---|---|
| Flexion | 45% Percent | 3-/5 |
| Extension | 45% Percent | 3-/5 |
| Right Rotation | 45% Percent | 3-/5 |
| Left Rotation | 45% Percent | 3-/5 |

**T-Spine - Passive Range Of Motion**

| Measurement | PROM |
|---|---|
| Rotation Left | 50% Percent |
| Rotation Right | 50% Percent |
| Extension | 50% Percent |
| Flexion | 50% Percent |

**T-Spine - Muscle Testing**

| Measurement | Right Strength | Right Flexibility | Left Strength | Left Flexibility |
|---|---|---|---|---|
| Latissimus Dorsi | 3/5 | Moderate Tightness | 3-/5 | Severe Tightness |
| Rhomboids | 3/5 | Moderate Tightness | 3-/5 | Severe Tightness |
| Serratus Anterior | 3/5 | Moderate Tightness | 3-/5 | Severe Tightness |
| Thoracic Paraspinals | 3/5 | Moderate Tightness | 3-/5 | Severe Tightness |

**T-Spine - Special Tests**

| Special Test | Right | Left |
|---|---|---|
| Rib Springing | Negative | Positive with Pain |

**T-Spine - Joint Mobility**

| Joint | Force Direction | Grade | End-Feel | Symptoms |
|---|---|---|---|---|
| Upper Thoracic | P/A Central | II | Muscle Spasm | Decreased |
| Middle Thoracic | P/A Central | II | Muscle Spasm | Decreased |
| Lower Thoracic | P/A Central | II | Muscle Spasm | Decreased |

### Palpation

Tenderness during palpation of Ribs. Tenderness during palpation of Sternum. Tenderness during palpation of Costal Cartilage. Tenderness during palpation of Clavicle. Tenderness during palpation of Abdomen. Tenderness during palpation of Scapula.

## Assessment

**Descriptions**

Patient presents with signs and symptoms consistent with a thoracic muscle sprain.
Patient understood injury and was involved in the creation of goals.

**Problem List**

| Problems |
|---|
| Pain limits functional activities |
| Decreased ROM preventing full functional activity |
| Decreased strength limiting functional activities |
| Decrease participation in recreational activities |
| Pain decreasing functional mobility |
| Marked muscle pain and tightness in thoracic spine. |

## Plan

**Goals**

| Length | Status | Goal |
|---|---|---|
| Short Term | Not Met | 1. Independent with home exercise program in 4 weeks. |
| Long Term | Not Met | 2. Patient able to participate in full recreational activities in 8 weeks. |
| Short Term | Not Met | 2a. Increase lumbar ROM by 50% in 4 weeks. |
| Long Term | Not Met | 2b. Increase strength to WNL in 8 weeks. |
| Long Term | Not Met | 3. Patient to report decreased pain by 75% with functional activities in 8 weeks. |
| Short Term | Not Met | 3a. Patient to report decreased pain by 50% measured by visual analog scale in 4 weeks. |
| Long Term | Not Met | Normal flexibility to allow normal movement patterns in 6 weeks. |
| Short Term | Not Met | Improve joint mobility by 50% in 4 weeks. |

**Treatment Plan**

**Recommend Physical Therapy 2 time(s) a week for 8 week(s), with treatments to consist of:** Body Mechanic Training (97110) - Proper positioning and lifting strategies, Core Stabilization (97110) - Increase strength and function of spinal stabilization muscles, Flexibility (97110) - active and passive patient stretching, Neuromuscular Re-ed - 97112: Improve neurologic control of muscle function, ROM (97110) - Passive or active activities to increase joint range of motion, Therapeutic Exercise - 97110: Improve muscle strength, ROM, flexibility, and muscle function, Cryotherapy- 97010: Application of cold to decrease local swelling and decrease pain, Heat- 97010: Application of heat to increase local circulation and decrease pain, IFC E-Stim- 97014: Application of E-Stim to modulate pain , Ultrasound- 97035: increase local circulation, improve tissue healing time, and modulate pain, Manual Stretching- 97140: passive or active stretching to improve muscle length and function, Soft Tissue Mobs- 97140: increase ROM tissue length, joint mechanics, and modulate pain, Spine Mobilization- 97140: increase ROM, improve joint mechanics, and modulate pain.

**Initial Treatment**

- Patient Education - Initial Evaluation: Pt. understood injury and its management. - 30 Total Minutes
- T-Spine - Cat/Camel Stretch: 5 times - 2 Total Minutes
- T-Spine - Back Extension: 2 x 10 - 2 Total Minutes
- T-Spine - Prone Scapular Retraction: 2 x 10 - 2 Total Minutes
- T-Spine - Prone I's,Y's,T's : 2 x 10 - 10 Total Minutes
- Manual - Myofascial Release: 10 Minutes - 10 Total Minutes
- T-Spine - thoracic rotation: 2 x 10 - 2 Total Minutes
- T-Spine - open books: 2 x 10 - 2 Total Minutes

**MD Communication:** Initial evaluation documented and communicated to the referring physician for accountability of care.

X ______________________________

Adewale S Adeniola, DPT License #: 018676

(Document electronically signed by TheraOffice Documentation)
4/28/2023

**To Be Completed By Physician:**

____ I have no revisions to this plan of care
____ Revise plan of care as follows
____ Discharge Patient

Prognosis: ____ Excellent ____ Good ____ Fair ____ Poor

Continue _____ times per _____ for _____ weeks / months

Physician Signature: ______________________________ Date:______________________________
n signing this document, physician certifies that prescribed rehabilitation is a medical necessity.

# Adex Physical Therapy, P.C

35 East 51st Street
Brooklyn NY 11203
Tel#: (718) 363 2556 Fax#: (718) 363 2677
Email#: adexphysicalt1@optonline.net

## Daily Note

| | | | |
|---|---|---|---|
| **Patient Name:** | Phillippe St Juste | **Date Seen:** | 6/22/2023 |
| **Diagnosis:** | S23.3XXA Sprain of ligaments of thoracic spine, initial encounter<br>M54.6 Pain in thoracic spine<br>M25.60 Stiffness of unspecified joint, not elsewhere classified<br>M62.81 Muscle weakness (generalized | **Referring Physician:** | Jerry Uduevbo |
| **Time In:** | 4:00 PM | **Time Out:** | 5:00 PM |

## Goals

| Length | Status | Goal |
|---|---|---|
| Short Term | In Progress | 1. Independent with home exercise program in 4 weeks. |
| Long Term | Not Met | 2. Patient able to participate in full recreational activities in 8 weeks. |
| Short Term | In Progress | 2a. Increase lumbar ROM by 50% in 4 weeks. |
| Long Term | In Progress | 2b. Increase strength to WNL in 8 weeks. |
| Long Term | In Progress | 3. Patient to report decreased pain by 75% with functional activities in 8 weeks. |
| Short Term | In Progress | 3a. Patient to report decreased pain by 50% measured by visual analog scale in 4 weeks. |
| Long Term | Not Met | Normal flexibility to allow normal movement patterns in 6 weeks. |
| Short Term | In Progress | Improve joint mobility by 50% in 4 weeks. |

## Subjective

Patient reports a decreased in symptoms since last visit.

## Objective

- T-Spine - Cat/Camel Stretch: 5 times - 3 Total Minutes
- T-Spine - Back Extension: 2 x 10 - 3 Total Minutes
- T-Spine - Prone Scapular Retraction: 2 x 10 - 3 Total Minutes
- T-Spine - Prone I's,Y's,T's : 2 x 10 - 10 Total Minutes
- Manual - Myofascial Release: 10 Minutes - 10 Total Minutes
- T-Spine - thoracic rotation: 2 x 10 - 3 Total Minutes
- T-Spine - open books: 2 x 10 - 3 Total Minutes
- Modality - IFC E-Stim: 40 mA - min x 15' - 15 Total Minutes
- Manual - Stretching: 10 Minutes - 10 Total Minutes

## Assessment

Tolerated with decreased symptoms and increased function

## Plan

Continue to progress per plan of care. Increase activity and exercise intensity next session.

X ______________________________________________

Adewale S Adenlola, DPT License #: 018676

**To Be Completed By Physician:**

____ I have no revisions to this plan of care

____ Revise plan of care as follows

____ Discharge Patient

Prognosis: ____ Excellent ____ Good ____ Fair ____ Poor

Continue _____ times per _____ for _____ weeks / months

Physician Signature: ______________________________ Date: ____________________

In signing this document, physician certifies that prescribed rehabilitation is a medical necessity.

*(Exhibit O showing phone records reflecting direct calls from Chase to Plaintiff between April 17, 2023 into May 2023)*




*(Exhibit P showing phone records reflecting multiple calls from Chase to Plaintiff on May 3, 2023 under false or misleading caller identities)*



*( Exhibit Q showing screenshot of text message exchange confirming Plaintiff's attorney as designated point of contact for Chase on May 4, 2023)*




*(Exhibit R showing voicemail left by a Chase representative on May 11, 2023 referencing a CFPB complaint after establishing Plaintiff's counsel as point of contact)*



*(Exhibit S showing account-related email statements sent by Chase between June 8, 2023 and August 25, 2023 following account closure)*




*(Exhibit T showing certified docket sheet reflecting dismissal of trespass charge against Plaintiff)*

# MUNICIPAL COURT OF PHILADELPHIA COUNTY

## DOCKET

**Docket Number: MC-51-SU-0001113-2023**

**SUMMARY DOCKET**

**Non-Traffic**

Commonwealth of Pennsylvania
v.
Phillippe St Juste



**ENTRIES**

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 3 | 07/24/2023 | | DiCicco, Christian A. |
| Order Granting Motion for Continuance | | | |
| 1 | 09/11/2023 | | Washington, Craig M. |
| Withdrawn | | | |

Exhibit T



Recent entries made in the court filing offices may not be immediately reflected on these docket sheets . Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.